**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a pension trust, and Howard McDougall, one of the present trustees, Plaintiff–Appellant,**

v.

**CENTRAL TRANSPORT, INCORPORATED, a corporation and Central Cartage, Incorporated, a corporation, Defendants–Appellees.**

No. 95–2055.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1996.

Decided June 7, 1996.

---

Albert M. Madden, Robert A. Coco, James P. Condon (argued), Cent. States, Southeast & Southwest Area Pension Fund, Rosemont, IL, for Plaintiff-Appellant.

George N. Leighton (argued), Grady B. Murdock, Jr., Neal & Associates, Chicago, IL, for Defendants–Appellees.

Before BAUER, FLAUM, and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

Successful litigation strategy requires crafting a viable theory of liability against a reasonably affluent defendant. The plaintiff-appellant in this case, Central States, Southeast and Southwest Areas Pension Fund ("Central States"), accomplished the former when it filed suit against D & S Leasing, Genessee Cartage Co., and Michiana Trucking, Inc. (collectively the "Rogers Group") for pension withdrawal liability. *See* 29 U.S.C. § 1381. In June 1990, Central States obtained a judgment against the Rogers Group jointly and severally for $957,246.37. Two years later, Central States obtained a judgment against George Rogers, the proprietor who owned the Rogers Group companies at the time they withdrew from the pension fund. By this time, the liability, including interest, exceeded $1.2 million. However, with the exception of $33,554.84 that George Rogers has paid personally, these judgments remain unsatisfied.

In their efforts to find a collectible defendant, Central States brought this action against Central Transport, Inc. ("Transport") and Central Cartage Co. ("Cartage"), claiming that these two companies were the "alter-egos" of the Rogers Group companies, and that they too should be liable for the unpaid pension contributions. Following a bench trial, the district court entered judgment in favor of Transport and Cartage. We affirm.

This case turns on the control of various current and former subsidiaries of CenTra, Inc., a Michigan corporation engaged in the cartage and over-the-road trucking industries. We begin with a review of the relevant cast of corporate characters:

**CenTra, Inc.:** A holding company and corporate parent of the defendants, Transport and Cartage. CenTra's annual gross income exceeds $300,000,000.

**GLS Leaseco, Inc.:** A wholly owned subsidiary of CenTra, Inc., GLS Leaseco is a Michigan corporation engaged in the employee leasing business. GLS Leaseco also was the corporate parent of Genessee Cartage ("Genessee") and Michiana Trucking ("Michiana"), two subsidiaries which Transport and Cartage organized to haul steel on behalf of General Motors. In May 1980, GLS Leaseco sold Genessee Cartage to Florence Vorce. In January 1981, it sold Michiana Trucking to Edward Dowgiert. Both Vorce and Dowgiert had previous affiliations with Transport and Cartage.

**D & S Leasing:** Incorporated in Michigan in July 1981, D & S Leasing provided dock workers and other employees for one of Cartage and Transport's facilities in Cleve-

land, Ohio. This arrangement lasted from 1982 until May 1986.

"**Rogers Group Companies**": A collective reference to Genessee, Michiana, and D & S Leasing. By the end of August 1984, George W. Rogers, a former employee of a Transport and Cartage affiliate, owned and controlled all three corporations. Rogers was the original owner of D & S Leasing. He acquired Genessee from Vorce, and Michiana from Dowgiert in August 1984.

## Background

As early as December 1973, Genessee Cartage and Michiana Trucking leased union truck drivers to Transport to haul steel for General Motors in the Flint, Michigan area. Since its incorporation in 1981, D & S Leasing has provided a similar service, leasing dock workers and other employees to one of Transport's facilities in Cleveland, Ohio. Under each of these arrangements, the Rogers Group paid the union employees at rates determined under "white paper" agreements that each company negotiated with the local unions of the International Brotherhood of Teamsters. The wage rates were lower than those provided in the Teamsters National Master Freight Agreement, but Central States reviewed, approved, and accepted the terms and conditions of all of the white paper agreements.

Throughout the terms of the leases, Transport and Cartage employees played central roles in the preparation and maintenance of payroll records, and in the recruitment, hiring, supervising, disciplining, and firing of Rogers Group employees. This involvement notwithstanding, George Rogers established a separate office for the three Rogers Group companies, and he hired and supervised his own office staff. The Rogers Group also controlled its own bank accounts from which it fulfilled all of its obligations to Central States.

The leasing arrangements continued until May 1986, when Transport ceased utilizing D & S Leasing to hire employees for their Cleveland site, and the Rogers Group ceased contributing to Central States. After notifying the Rogers Group companies of unpaid pension contributions, Central States filed

suit in the United States District Court for the Eastern District of Michigan. Central States sued the Rogers Group in 1989, and George Rogers personally in 1990. *See Central States Southeast and Southwest Areas Pension Fund v. Rogers,* 843 F.Supp. 1135 (E.D.Mich.1992), *aff'd. without opinion,* 14 F.3d 600 (6th Cir.1993).

*Central States* prevailed in both suits but, unable to collect either judgment, filed this action under the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), the amendment to the Employee Retirement Income Security Act of 1974 ("ERISA"), which imposes liability on employers who withdraw from multiemployer pension funds for their proportionate share of unfunded vested benefits. 29 U.S.C. §§ 1381, *et. seq. See .also Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Leaseway Transportation Corp.,* 76 F.3d 824, 827 (7th Cir.1996). *Central States'* theory is that the defendants so dominated and controlled the Rogers Group companies that they were essentially the Rogers Group's "alter-egos" for the pension obligations.

## Analysis

■ The district court denied the defendants' motion for summary judgment and conducted a four-day bench trial. After finding that Central States had failed to prove that Transport and Cartage "completely dominated" the Rogers Group, the district court entered judgment for the defendants on April 5, 1995. We review the district court's findings of fact for clear error and its conclusions of law *de novo. Northwestern Nat. Ins. Co. of Milwaukee, Wisconsin v. Lutz,* 71 F.3d 671, 674 (7th Cir.1995).

■ Before turning to the merits of *Central States'* claim, we pause to consider the issue of subject matter jurisdiction in light of the Supreme Court's recent decision in *Peacock v. Thomas,* —— U.S. ——, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996). *Peacock* generally precludes both ERISA jurisdiction and ancillary federal jurisdiction over suits to enforce previously obtained ERISA judgments. *Id.* at ——, 116 S.Ct. at 866–67. While the lawsuit in *Peacock* is similar to *Central*

*States'* suit against Central Transport, the two are distinguishable.

In *Peacock,* Thomas brought suit under ERISA against his corporate employer and against an individual officer and shareholder, Peacock, for benefits due under the corporation's pension benefits plan. After ruling that Peacock was not a fiduciary, and thus not a proper defendant under ERISA, the district court entered judgment against the corporation only. *See Thomas v. Tru–Tech, Inc.,* No. 87–2243–3, 1988 WL 212511 (D.S.C.), *aff'd. without opinion,* 900 F.2d 256 (4th Cir.1990). Thomas tried and failed to collect the judgment from the corporation, and then filed another suit against Peacock, asserting a claim for "Piercing the Corporate Veil Under ERISA and Applicable Federal Law." *Peacock,* —— U.S. at —— – ——, 116 S.Ct. at 865–66. This latter suit ultimately wound its way to the Supreme Court.

The Supreme Court held that Thomas' veil-piercing claim did not state a cause of action under ERISA and could not independently support federal question jurisdiction. *Id.* In the Court's view, Thomas' lawsuit was an attempt to use ancillary jurisdiction "to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.* at ——, 116 S.Ct. at 868, *citing H.C. Cook Co. v. Beecher,* 217 U.S. 497, 30 S.Ct. 601, 54 L.Ed. 855 (1910). Thomas did not claim that Peacock was liable for the underlying ERISA violation. Indeed, after the district court's initial judgment, he was precluded from doing so.

Central States, however, has styled its theory of liability somewhat differently, alleging that Central Transport and Central Cartage so dominated and controlled the Rogers Group Companies that they were the "true employers" for purposes of ERISA liability. Under this theory, Central States is not pursuing the defendant corporations merely to enforce a judgment. Rather, Central States is claiming that Central Transport and Central Cartage played a part in the initial ERISA violation. This theory is different from *Peacock's,* where Thomas pursued Peacock solely in his capacity as an officer and shareholder of the liable corporation. Thomas' lawsuit attempted to "pierce the corporate veil." By contrast, Central States claims that the defendants exercised "common control." The former can be characterized more generically as a suit to enforce a judgment, while the latter is a specific claim for relief under ERISA.

This distinction between "common control" and "veil-piercing" is consistent with the approach we recently have taken in *Central States, Southeast and Southwest Areas Pension Fund v. Art Pape Transfer, Inc.,* 79 F.3d 651 (7th Cir.1996). The facts of *Art Pape Transfer,* which begin with an employer's withdrawal from a pension fund, are similar to those in the instant lawsuit. After Ringle Express withdrew from the Central States Pension Fund, Central States brought suit under ERISA and under the MPPAA against McGriff Corporation, Ringle's parent at the time it withdrew, and other related defendants to recover the unpaid benefit contributions. *Id.* at 652. In the course of the litigation, however, Central States reached a settlement with some of the potentially liable defendants. The settlement released from ERISA liability "the McGriffs and all members of any group of trades or businesses under common control with Ringle." *Id.* A separate clause of the settlement agreement noted that the release inured not only to the benefit of the parties, but also to "related corporations." *Id.*

In *Art Pape Transfer,* we began our analysis by inquiring whether common control existed among the respective defendants. *Id.* at 652–653. This analysis created an obvious problem for Central States in that case, because if common control existed, "there may be liability but the release blocks recovery." But, if there were no " 'common control', then there is no release, but also no liability." *Id.* As we pointed out, Art Pape Transfer would win either way. To avoid this insurmountable hurdle, the Art Pape plaintiffs crafted a theory of alter-ego (i.e. veil-piercing) liability under state law. However, this approach ran directly into the jurisdictional wall raised by *Peacock.*

The resulting legal landscape distinguishes "common control," a theory that may have supported liability in *Art Pape Transfer* but for the release, and "veil-piercing," which is

dead after *Peacock*. Central States' claim in the instant lawsuit alleges common control, and the district court therefore properly assumed subject matter jurisdiction.

We now turn to the issue of the defendants' liability, if any, arising under section 1381 of MPPAA which provides:

> If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

29 U.S.C. § 1381(a).

■ The statute does not define the term "employer." Several circuits have confronted this question, and define an employer for purposes of MPPAA as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Seaway Port Authority v. Duluth–Superior ILA Marine Ass'n. Restated Pension Plan*, 920 F.2d 503, 507 (8th Cir.1990), *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Carriers Container Council, Inc. v. Mobile Steamship Ass'n–Int'l Longshoremen's Ass'n, AFL–CIO Pension Plan & Trust*, 896 F.2d 1330, 1343 (11th Cir.), *cert. denied*, 498 U.S. 926, 111 S.Ct. 308, 112 L.Ed.2d 261 (1990); *Korea Shipping Corp. v. New York Shipping Ass'n—Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1537 (2nd Cir.1989). Therefore, the appropriate inquiry is whether the alleged employer had an obligation to contribute as well as the nature of that obligation. *Seaway*, 920 F.2d at 508.

The Eighth Circuit recently applied this definition in a situation similar to that in this case in *Rheem Manufacturing Co. v. Central States Southeast and Southwest Areas Pension Fund*, 63 F.3d 703 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1016, 134 L.Ed.2d 96 (1996). In *Rheem*, an equipment manufacturer had leased truck drivers from an employee leasing company to distribute its products. The manufacturer selected and supervised the drivers, and negotiated the terms and conditions of the drivers' employment with the appropriate unions. These functions notwithstanding, the leasing company was the signatory to the collective bargaining agreement with the union. While the manufacturer paid the leasing company for the total number of drivers and the miles driven, the leasing company kept the payroll records, provided the drivers' benefits, and contributed to the multiemployer pension fund. When the leasing company withdrew from the fund, the manufacturer sought a declaratory judgment excusing it from withdrawal liability. Holding that the manufacturer was not an employer for the purposes of MPPAA, the Eighth Circuit noted that the nature of the obligation to contribute was contractual, and therefore the party "who is signatory to a contract creating the obligation to contribute is the 'employer' for purposes of establishing withdrawal liability." *Rheem*, 63 F.3d at 707.

This analysis would excuse Cartage and Transport from withdrawal liability. However, *Rheem* left open the question of whether, in the case of an insolvent shell agent and a potentially fraudulent arrangement, a court would look behind the contractual obligor to the "true employer." *Id.* at 707 n. 5. That situation is precisely the claim that Central States has made against the defendants in the instant case.

■ The district court set forth the proper standard for when to disregard the corporate form to allow recovery of unpaid pension contributions. The factors a court should consider are 1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity. *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 461 (7th Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991), *citing Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Service, Inc.*, 736 F.2d 516, 524 (9th Cir.1984).

■ In their effort to portray Transport, Cartage, and the Rogers Group as one entity, Central States relies on proceedings before the National Labor Relations Board involving CenTra. *See NLRB v. CenTra, Inc.*, 299 NLRB 658 (1990), *enforcement granted*, 954

F.2d 366 (6th Cir.1992), *cert. denied,* —— U.S. ——, 115 S.Ct. 462, 130 L.Ed.2d 370 (1994). In these proceedings, the Board concluded that Transport, Cartage, and D & S Leasing were joint employers of the leased workers at the Cleveland facility. Although this finding occurred in the context of adjudicating an unfair labor practice, Central States contends that it should be preclusive. However, because the Board did not examine the overall corporate relationship among the employers or the underlying purposes of the lease arrangements, its findings do not resolve the issue of respect for corporate form.

■ Central States argues that Cartage and Transport's direct control over the Rogers Group's hiring, recruiting, supervising, and maintenance of payroll records was sufficient to create "alter-ego" liability for the unpaid pension contributions. The extent of the interrelationship among the Rogers Group and the two defendants suggests a lack of respect for the separate identity of the corporations. However, it says nothing about the fraudulent intent of the incorporators. Essential to the application of the alter-ego doctrine is a finding of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as a sham transfer of assets. *Trustees of Pension Funds of Local 701 v. Favia,* 995 F.2d 785, 789 (7th Cir.1993). In sum, unlawful motive or intent are critical inquiries in an alter-ego analysis. *Id.,* citing *Int'l Union of Operating Engineers, Local 150, AFL–CIO v. Centor Contractors, Inc.,* 831 F.2d 1309, 1312 (7th Cir.1987).

■ Central States essentially makes a policy argument that the standard for disregarding corporate form should be lower in this type of case than in a typical contract dispute. We acknowledge that the underlying congressional policy behind ERISA favors the disregard of the corporate entity in cases where employees are denied their pension benefits. *Lumpkin,* 933 F.2d at 461. However, such policy interests are not at stake here. This suit does not involve an individual pensioner's claim for benefits. Rather, it involves a multiemployer pension fund's attempt to collect a share of unpaid

contributions. Congress enacted the amendments creating partial withdrawal liability in order to insulate an ERISA plan from major and sustained reductions in its contribution base. *See Central States Pension Fund v. Robinson Cartage,* 55 F.3d 1318, 1323 (7th Cir.1995). The requirement of showing some fraudulent intent on the part of Transport or Cartage applies here, and Central States has failed to do so.

■ As an alternative to arguing that no fraud is required to create alter-ego liability, Central States claims that Transport and Cartage orchestrated several sham transactions by selling off the Rogers Group companies to former employees. The district court found that Central States failed to prove by a preponderance of the evidence that Transport or Cartage sold its subsidiaries to Florence Vorce or Edward Dowgiert as a part of a fraudulent plan to avoid paying higher wages or benefits to its employees. The district court made similar findings with respect to the incorporation of D & S Leasing, and George Rogers' subsequent purchases of Genessee and Michiana.

Central States was well aware of the relationship among Transport, Cartage, and the Rogers Group companies, and there is no indication that any of the employers withheld or disguised its corporate identity. Moreover, Central States reviewed and approved each of the white paper agreements with the respective Rogers Group companies. Perhaps the most telling evidence of its awareness is the fact that Central States did not name Transport or Cartage as defendants in either of its first two lawsuits. Rather, Central States waited. Now that the Rogers Group and George Rogers are unable to pay, Central States has decided to challenge the corporate form.

This last point is a reminder that while Central States' allegations seem viable in the abstract, its arguments on appeal are in large part a recitation of what Central States was unable to prove before the district court. The allegations were sufficient to defeat defendants' motion for summary judgment, but after hearing the testimony, reviewing the evidence, and evaluating the credibility of the

witnesses, the district court found that Central States had failed to meet its burden of proof. There is sufficient evidence in the record to support these findings, and under a clearly erroneous standard, we see no need to disturb them.

### Conclusion

For the foregoing reasons, the district court's entry of judgment in favor of Transport and Cartage is

AFFIRMED.