In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2497

BOARD OF TRUSTEES OF THE AUTOMOBILE MECHANICS' LOCAL
No. 701 UNION AND INDUSTRY PENSION FUND,

*Plaintiff-Appellant,*

*v.*

FULL CIRCLE GROUP, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 5868 — **Charles P. Kocoras**, *Judge.*

ARGUED MAY 23, 2016 — DECIDED JUNE 24, 2016

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, a board that administers a multiemployer defined-benefit pension plan sponsored by Mechanics' Local Union No. 701, filed this suit against a company named Full Circle Group and its subsidiaries seeking to impose withdrawal liability on them (we'll treat all the companies as a single entity, which we'll dub FCG).

The Multiemployer Pension Plan Amendments Act of 1980 amended ERISA by imposing liability on employers who withdraw, partially or completely, from participation in an underfunded multiemployer pension fund, thereby reducing the fund's already diminished resources for paying the pensions to which employees of the fund's members are contractually entitled. See 29 U.S.C. §§ 1381 *et seq.*; *Central States, Southeast & Southwest Areas Pension Funds v. Bulk Transport Corp.*, 820 F.3d 884 (7th Cir. 2016). The pension board's appeal is from the district court's grant of summary judgment in favor of FCG and the resulting entry of a final judgment in its favor.

FCG purchased the assets of a shipping and shipyard services company named Hannah Maritime Corporation (HMC, the parties call it, as will we), whose president was Donald Hannah. HMC had a collective bargaining agreement with the mechanics union that required it to make contributions to the union's pension fund to finance pensions for HMC's employees.

Hannah had hired his son Mark to work at HMC in 2007. The following year Mark formed FCG, and the new company bought two land leases and shipyard equipment from HMC and also hired HMC's shipyard service employees. No significant liabilities of HMC were explicitly transferred to the new company—notably, HMC's withdrawal liability was not transferred. FCG tried to negotiate its own collective bargaining agreement with the union, and though the attempt failed the company contributed to the union's pension fund until the company's employees voted to decertify the union in 2009. With HMC having ceased contributing to the fund, the fund assessed withdrawal liability against it. But in

the meantime HMC had become insolvent, which prompted this suit in which the fund seeks to impose HMC's liability to the fund on FCG as HMC's successor.

The district judge did not decide whether FCG could be said merely to have continued HMC's business, just under a different name, a question complicated by the fact that not all of FCG's employees were former employees of HMC and by uncertainty as to just how similar FCG's business was to what HMC's business had been. The judge was concerned that deciding that issue would require a trial. Instead he focused on a second requirement for successor liability—that the successor be aware of its predecessor's liability. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995); *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326 (7th Cir. 1990).

It would be plausible that having worked for HMC and being the owner's son, Mark Hannah would have been aware of the company's obligations to contribute to a union pension fund, though we can't be certain that he learned of these obligations before the agreement to transfer assets to the newly created FCG. It is a virtual certainty however that he knew before the agreement was made that HMC was unionized, if only because it was something his father was bound to mention—indeed to be preoccupied with because unionization limits a company's control over and dealings with its employees. Mark testified that he was aware of the union pension fund, and the obligation to contribute to it, by July 1, 2008, the date the transaction closed.

The "general [federal] common law rule of successor liability holds that … where one company sells its assets to an-

other company, the latter is not liable for the debts and lia-
bilities of the seller." *Tsareff v. ManWeb Services, Inc.*, 794 F.3d
841, 845 (7th Cir. 2015). But as explained in *EEOC v. Vucitech*,
842 F.2d 936, 944 (7th Cir. 1988) (citations omitted), there
need to be exceptions to that rule:

> The entire issue of successor liability … is dreadfully
> tangled, reflecting the difficulty of striking the right bal-
> ance between the competing interests at stake. In favor of
> successor liability is the interest in preventing tortfeasors
> from externalizing the costs of their misconduct by selling
> their assets free of any liabilities and distributing the pro-
> ceeds to their shareholders. Against is the interest in a flu-
> id market in corporate assets, which is impeded if pur-
> chasers acquire along with the assets legal liabilities of un-
> known, sometimes unknowable, dimensions. The latter
> consideration dominated common law thinking until re-
> cent years, producing a rule, now eroding, that in a sale of
> assets … as distinct from a merger or consolidation, the
> purchaser took free of any liabilities not expressly as-
> sumed, including tort liabilities.
>
> A similar but looser approach, in which the focus is on
> the continuity between the predecessor's and successor's
> businesses and [on] the [successor's] notice of the [prede-
> cessor's] acts, has long been followed in labor cases in
> which the issue is the successor's duty to honor the obliga-
> tions assumed by [the] predecessor in a collective bargain-
> ing agreement.

The parties agree that we should use the "similar but looser
approach" described in *Vucitech* and reiterated in other cas-
es—an approach that focuses on the continuity between the
predecessor's and successor's businesses and on the latter's
notice of the former's acts. Knowing that HMC was union-
ized Mark would almost certainly also have known that the

company would be required to contribute to a union pension fund if there was one. That knowledge should have alerted him to the possibility of withdrawal liability, which he could have verified by asking HMC to get an estimate from the union of the union's liabilities to its members. See 29 U.S.C. § 1021(l). That would have eliminated the possibility that successor liability would impose a crushing debt on FCG, for once Mark learned what FCG's successor liability would or might be he could, depending on its size, have refused to buy HMC's assets; for if no assets are bought, no liabilities are assumed.

The district court granted summary judgment in favor of FCG for two reasons, the first being lack of evidence that Mark knew about the pension fund and the possibility of withdrawal liability before signing the asset-acquisition agreement. Yet he knew about the pension contributions *by July*, implying that he had learned about them earlier, and he had lawyers advising him on the acquisition of HMC's assets and its unionized employees. It is thus plausible that he knew about the pension contributions in April, when by signing the asset-acquisition agreement he was alerted to the possibility of withdrawal liability.

The district judge's second reason for granting summary judgment in favor of FCG was that even if Mark did know about the pension contributions when he signed the agreement, he may not have known about the withdrawal liability, as it was still hypothetical—it would not be assessed until after HMC ceased operations.

Critically in giving these reasons for granting summary judgment in favor of FCG the district judge did not have the benefit of our decision (not yet rendered) in *Tsareff v. Man-*

*Web Services, Inc.*, *supra*, 794 F.3d at 844–47. There we ex-
plained that an asset buyer is on notice of, and therefore sub-
ject to, successor liability if he has "notice that the seller may
be contingently liable for withdrawal liability." The buyer in
that case knew that the seller was obligated to contribute to
an underfunded pension fund and that there was a risk of
withdrawal liability, and therefore the buyer had an oppor-
tunity to protect itself by investigating the possible liability
and negotiating a purchase price that would take it into ac-
count. Mark Hannah may never have heard of withdrawal
liability or known that the union pension fund was under-
funded (implying that the employer and any successor to the
employer had withdrawal liability), but knowing that he
was dealing with a union pension fund he was on notice that
there was a possibility of such liability. A lack of familiarity
with the concept of withdrawal liability cannot be an excuse;
he had lawyers to advise him on FCG's legal obligations.

Further evidence of notice is the fact known if not to him
then (again) to his advisers that *most* union pension funds
are underfunded: 81 percent in 2005, and that year 39 per-
cent hadn't even had 80 percent of the funds they would
have needed in order to be able to pay the benefits they were
required to pay. Diana Furchgott-Roth, "Union vs. Private
Pension Plans: How Secure are Union Members' Retire-
ments?" 9–11 *Hudson Institute* (Summer 2008), www.hudson.
org/content/researchattachments/attachment/882/unionvspri
vatepensionplans.pdf (visited June 23, 2016, as were the oth-
er websites cited in this opinion). As late as 2013, 41 percent
of union pension plans either had fewer than 80 percent of
the funds they needed in order to be able to pay benefits that
they owed, or faced a funding deficiency within seven years.
Alicia H. Munnell & Jean-Pierre Aubry, "The Financial Sta-

tus of Private Sector Multiemployer Pension Plans" 1–2, *Center for Retirement Research at Boston College* (Sept. 2014), http://crr.bc.edu/wp-content/uploads/2014/08/IB_14-14.pdf. Further, in 2010 78 percent of union workers had defined-benefit pension plans. A defined-benefit plan is, as the name implies, a pension plan that promises definite benefits, as opposed to benefits based on what the employee contributes. It is the defined-benefit model that can lead to underfunding. See AFL-CIO, "Retirement Security: Pensions," www.aflcio.org/Issues/Retirement-Security/Pensions. So defined-benefit plans are common in unionized firms and there is a high probability of such a plan's being underfunded.

As noted in *Tsareff v. ManWeb Services, Inc.*, *supra*, 794 F.3d at 845, "substantial continuity in the operation of the business before and after the sale" of its assets is a requirement for successor liability. For had the business not changed there would be no reason for its financial structure to change—no reason therefore to allow the successor company to obtain a windfall by acquiring assets free of liabilities, leaving its predecessor with liabilities but no assets. Enough evidence was presented of continuity of business between HMC and FCG to preclude summary judgment in favor of FCG on grounds of discontinuity, and enough notice that FCG (which is to say Mark Hannah) had notice of HMC's pension fund liability to preclude summary judgment on the ground that FCG lacked notice of possible successor liability.

The district judge also granted summary judgment in favor of FCG with regard to a second claim made by the pension fund, that of alter ego liability. If FCG is the same company as HMC and thus by definition its alter ego—the requi-

site sameness being inferred from such practices as commingling of the funds of the two companies, identity of their key personnel, and disregard of legal formalities—then HMC's withdrawal liability is FCG's liability. But we have held that fraudulent intent is required for alter ego liability, *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1287–88 (7th Cir. 1996), and it has not been shown in this case. The pension fund notes cases in other circuits which suggest that fraudulent intent, while a factor in deciding whether there is alter ego liability, is not necessarily an essential factor. But in this case at least, if fraudulent intent is subtracted as a factor all that is left are factors that establish successor liability. And as to those factors the district court's grant of judgment in favor of FCG was premature.

The case must therefore be returned to the district court for a trial. The district court's judgment is therefore

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.