**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HEAVENLY HANA LLC, DBA Travaasa Hotel Hana; GREEN TEA LLC, DBA Green Tea Management LLC; AMSTAR-39, LLC, *Plaintiffs-Counter-Defendants-Appellees*, | No. 16-15481 D.C. No. 3:14-cv-03743-JCS |
| v. | OPINION |
| HOTEL UNION & HOTEL INDUSTRY OF HAWAII PENSION PLAN, *Defendant-Counter-Claimant-Appellant.* | |

Appeal from the United States District Court
for the Northern District of California
Joseph C. Spero, Magistrate Judge, Presiding

Argued and Submitted February 15, 2018
Pasadena, California

Filed June 1, 2018

Before: Sidney R. Thomas, Chief Judge, and Raymond C. Fisher and Michelle T. Friedland[*], Circuit Judges.

Opinion by Chief Judge Thomas

## SUMMARY[**]

### Multiemployer Pension Plan Amendment Act

The panel reversed the district court's judgment, after a bench trial, in favor of the plaintiffs in an action under the Multiemployer Pension Plan Amendment Act.

The panel held that the plaintiffs were required to assume the unpaid withdrawal liability of their predecessor to a multiemployer pension plan.  The panel held that a constructive notice standard applied, and the plaintiffs were on constructive notice of potential withdrawal liability because a reasonable purchaser would have discovered their predecessor's withdrawal liability.

---

[*] Following the death of Judge Reinhardt, Judge Friedland was randomly drawn to replace him on the panel.  She has read the briefs, reviewed the record, and watched a video recording of oral argument.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kimberly C. Weber (argued), Sarah Grossman-Swenson, and Steven L. Stemerman, Davis Cowell & Bowe LLP, San Francisco, California, for Defendant-Appellant.

Wendy McGuire Coats (argued), Fisher & Phillips LLP, San Francisco, California, for Plaintiffs-Appellees.

**OPINION**

THOMAS, Chief Judge:

We consider in this case whether a company must assume the unpaid withdrawal liability of its predecessor to a multiemployer pension plan if it was on constructive notice of potential withdrawal liability. We conclude that it must, and we reverse the judgment of the district court.

I

A multiemployer pension plan typically covers the employees of two or more unrelated companies—usually engaged in the same type of business in the same geographic area—in accordance with a collective bargaining agreement. The employees' unions negotiate employer contributions to support the pension plan.

Such plans are generally covered by the Multiemployer Pension Plan Amendment Act ("MPPAA" or "the Act"), which revised the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1301(a)(3). The Act provided "a series of amendments to ERISA aimed at minimizing 'the

adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans.'" *Tsareff v. ManWeb Servs., Inc*, 794 F.3d 841, 845 (7th Cir. 2015) (alterations in original) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984)). "The concern was that 'a significant number of [multiemployer] plans were experiencing extreme financial hardship' as a result of individual employer withdrawals from the plans, which saddled the remaining employers with increased funding obligations." *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering Inc.*, 801 F.3d 1079, 1088 (9th Cir. 2015) (alteration in original) (quoting *R.A. Gray & Co.*, 467 U.S. at 721).

To minimize these risks, the Act requires that when "an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, [ ] the employer is liable to the plan . . . [for] withdrawal liability." 29 U.S.C. § 1381(a). The withdrawal liability equals the "allocable amount of unfunded vested benefits," with specified statutory adjustments. *Id.* § 1381(b)(1).

If a participating employer sells its assets, the asset purchaser may be liable for the employer's withdrawal from a multiemployer plan. The "successorship doctrine . . . holds legally responsible for obligations arising under federal labor and employment statutes businesses that are substantial continuations of entities with such obligations." *Resilient Floor*, 801 F.3d at 1090 (citing *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326 (7th Cir. 1990)). This "exception from the general [common law] rule that a purchaser of assets does not acquire a seller's liabilities" applies to withdrawal liability if two

conditions are met. *Chi. Truck Drivers, Helper &Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin*, 59 F.3d 48, 49 (7th Cir. 1995) (citation omitted). The purchaser must (1) be a successor, and (2) have notice of the withdrawal liability. *Resilient Floor*, 801 F.3d at 1084.

This case involves the Hotel Union & Hotel Industry of Hawaii Pension Plan ("the Plan"), a multiemployer plan that represents over 12,000 members who work at unionized hotels in Hawaii, and the Ohana Hotel Company, LLC ("Ohana"), which operated the Ohana Hotel ("Hotel") on the island of Maui in Hawaii. Pursuant to a collective bargaining agreement with the hotel workers' union, Local 5 of UNITE HERE ("Local 5"), Ohana contributed to the Plan for its Hotel employees.

A private equity group consisting of Heavenly Hana LLC, Green Tree Management, and their parent company Amstar-39 (collectively "Amstar") entered into a purchase and sale agreement ("Agreement") with Ohana on December 31, 2009, to purchase the Hotel and related assets.

Amstar had prior experience with multiemployer pension plans. It had previously owned and operated a hotel that participated in a multiemployer pension plan. In prior business transactions, Amstar had also "instructed its agents to inquire about whether Amstar could incur liability to a multiemployer pension plan."

The Agreement indicates that employees at the Hotel were unionized and that Ohana had previously made contributions to a multiemployer pension plan. Although the Agreement required Ohana to provide Amstar with notice of Plan funding deficiencies, Amstar did not receive any to

review.  Amstar also secured legal advice prior to closing, which turned out to be incorrect, that "[a]bsent an express assumption of liability, the Buyer does not assume the [withdrawal] liability."

A four-person Amstar due diligence team undertook an investigation of the Hotel, which included a review of relevant documents and the condition of the hotel.  At the conclusion of Amstar's due diligence, the purchase price fell from $17 million to $14.5 million to account for deferred maintenance costs.

Ten days before the deal closed, Ohana stopped contributing to the Plan, and on closing day Ohana formally withdrew from the Plan.  The existence of unfunded vested benefit liabilities on the day of Ohana's withdrawal resulted in withdrawal liability for Ohana under the Act.

The Plan was underfunded for years before Ohana withdrew.  In 2008 and 2009, the Plan's administrator, Benefit and Risk Management Services ("BRMS"), issued annual funding notices to Ohana indicating that the Plan was underfunded for each plan year since 2006–2007.  These funding notices were publicly accessible on BRMS's website and Local 5's website.

After closing, Amstar continued to use the same buildings, grounds, and equipment to operate the Hotel, which continued to appeal to beach vacationers.  Employees' responsibilities largely remained the same under Amstar.  A majority of the seventy-seven employees that worked for Amstar, including the general manager, previously worked for Ohana.  Accordingly, Amstar recognized Local 5 as the employees'  bargaining unit,  but  developed  its  own

employment terms, including benefit plans, rather than adopting the CBA Ohana had negotiated with Local 5. Amstar also changed the Hotel's name a year after the purchase and began to market to adventure travelers rather than luxury travelers.

The Plan had knowledge of Ohana's withdrawal, but did not make a formal claim for withdrawal liability against either Ohana or Amstar until after the Agreement had been finalized.

The Plan sent its first demand letter to Amstar in December 2012, requesting $757,981 in withdrawal liability paid in a single lump sum or quarterly installments of $74,566. In response to the letter, Amstar made five quarterly payments totaling $372,780 before filing the present lawsuit to contest its responsibility for the withdrawal liability.

After a bench trial on the papers, the district court concluded that Amstar was not responsible for the withdrawal liability. Although sufficient continuity in operation of the hotel existed for Amstar to qualify as Ohana's successor, the district court determined that Amstar was not liable because it lacked "actual notice" of the withdrawal liability. In reaching this conclusion, the district court rejected the Plan's proposed "constructive notice" standard. However, the district court alternatively noted that even under a "constructive notice" standard, Amstar lacked notice because it acted diligently and reasonably under the circumstances and still did not discover the withdrawal liability. Judgment was then entered directing the Plan to return the $372,780 in withdrawal liability payments, plus interest, to Amstar. This timely appeal followed.

We review the district court's findings of fact for clear error. *Resilient Floor*, 801 F.3d at 1088. Questions of law, such as the standard for successor liability, are reviewed de novo. *Id.* Similarly, we review mixed questions of law and fact, including the application of the successorship doctrine's two elements to the facts of a case, de novo. *Id.*; *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 357 (7th Cir. 2014); *see also Haw. Carpenters Tr. Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 294 (9th Cir. 1987) ("[W]e hold that the undisputed facts demonstrate sufficient continuity in the enterprise to require the legal conclusion that [the purchaser] was the successor to [the seller].").

## II

As we have noted, in order for an asset purchaser to incur withdrawal liability, it must (1) be a successor, and (2) have notice of the withdrawal liability. *Resilient Floor*, 801 F.3d at 1084. Amstar does not dispute that it qualifies as a successor, and the Plan concedes that Amstar did not have actual notice of withdrawal liability. Therefore, the remaining questions are (1) whether constructive notice is sufficient to impose successor withdrawal liability and, if so, (2) whether Amstar was placed on constructive notice in this case.

## A

We turn first to the Act for guidance as to successor withdrawal liability. In doing so, we employ the usual tools of statutory construction, looking first at the plain words of the statute and "particularly to the provisions made therein for enforcement and relief." *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). "[W]hen

deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, __ U.S. __, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). In addition, we examine the legislative history, the statutory structure, and "other traditional aids of statutory interpretation" in order to ascertain congressional intent. *Nat'l Sea Clammers Ass'n*, 453 U.S. at 13. As part of statutory analysis, "[w]e also look to similar provisions within the statute as a whole and the language of related or similar statutes to aid in interpretation." *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

The text of the Act does not, on its face, address successor withdrawal liability. However, the Act's purpose and legislative history provide significant guidance as to congressional intent. ERISA itself was designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *R.A. Gray & Co.*, 467 U.S. at 720.

Congress passed the MPPAA to "protect [multiemployer pension] plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Resilient Floor*, 801 F.3d at 1088 (alteration in original) (quoting *R.A. Gray & Co.*, 467 U.S. at 722). As the House Education and Labor Committee emphasized in its Report on the Act:

> The primary purpose of the legislation is to protect retirees and workers who are participants in such plans against the loss of

> their pensions.  The Act is designated to foster plan continuation and growth because plan continuation and growth provide participants and beneficiaries [with the] greatest security against benefit loss.

H.R. Rep. No. 96-869(I), at *51 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2919.

The Report noted a "significant decline in the number of contributors" and highlighted the problems posed by employers withdrawing from multiemployer pension plans. *Id.* at *53–54.  It reported that a significant number of multiemployer pension plans were experiencing significant financial hardship.  *Id.* at *55–56.[1]  Thus, "[c]ourts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans."  *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986) (citing *Smith v. CMTA-IAM Pension Tr.*, 746 F.2d 587, 589 (9th Cir. 1984)).

A constructive notice requirement is consistent with the MPPAA's intended purpose and liberal construction.  Under a constructive notice standard, purchasers are deemed to have notice of any facts that "one using reasonable care or diligence should have."  *Constructive Knowledge*, Black's Law Dictionary (10th ed. 2014); *see also Beneficial Standard*

---

[1] The Seventh Circuit has noted that the national concerns about underfunding of union pension plans that motivated Congress remain equally important today.  *See Bd. of Trs. of the Auto. Mechs.' Local No. 701 Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 997–98 (7th Cir. 2016) (detailing the national underfunding statistics).

*Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988) ("The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud.").

This is not an unfamiliar standard in the employment and labor context. Indeed, we imposed a constructive notice standard in assessing withdrawal liability under ERISA's controlled group provision, which "prevent[s] businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Teamsters Pension Tr. Fund-Bd. of Trs. v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987) (quoting *Bd. of Trs. v. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987)). Relying on a liberal construction of ERISA and looking to the purpose underlying the controlled group provision, we held that "notice to the withdrawing employer is notice to all members of the controlled group" of corporations, which then shared liability for the withdrawal. *Id.*; *see also* 29 U.S.C. § 1301(b)(1) ("[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.").

Several of our sister circuits also consider an employer's constructive knowledge in assessing successor liability in other contexts. In *Brzozowski v. Correctional Physician Services, Inc.*, 360 F.3d 173, 178–79 (3d Cir. 2004), for example, the Third Circuit concluded that the district court erred in preventing an employee from joining a purchaser as an additional defendant in her Title VII gender discrimination case. The court instructed that on remand, "[t]he plaintiff should be given the opportunity to establish her claim of

successor liability" against the purchaser, noting that the purchaser "*had means at its disposal to anticipate such a situation* and offset expected costs associated with a potential claim." *Id.* (emphasis added).

Similarly, in *EEOC v. Vucitech*, 842 F.2d 936 (7th Cir. 1988), the Seventh Circuit concluded that a purchaser was liable for Title VII sex discrimination claims against the seller because the purchaser's owner had either "actual or constructive" knowledge of the claims before the purchase. *Id.* at 945–46.[2]

Other courts have reached similar conclusions. *See, e.g.*, *Dominguez v. Hotel, Motel, Rest. & Miscellaneous Bartenders Union, Local No. 64*, 674 F.2d 732, 733 (8th Cir. 1982) (concluding that the purchaser did not assume liability for a prior discriminatory employment practice because "it had no direct or *indirect knowledge* of appellant's allegations of discrimination" (emphasis added)).

A constructive notice standard also fairly balances "the national policies underlying the statute at issue and the interests of the affected parties." *Resilient Floor*, 801 F.3d at 1091 (quoting *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 782 (9th Cir. 2010)); *id.* ("Because the origins of successor liability are equitable, fairness is a prime consideration in its application." (quoting *Sullivan*, 623 F.3d at 782)).  Requiring purchasers to make reasonable inquiries

---

[2] Although the Seventh Circuit has not expressly adopted a constructive notice standard for successor withdrawal liability under the MPPAA, it has held that a "lack of familiarity with the concept of withdrawal liability cannot be an excuse" for a purchaser. *Full Circle Grp.*, 826 F.3d at 997.

into the existence of withdrawal liability advances the congressional interest in preventing underfunding in multiemployer pension plans. Imposing this burden would also have little negative impact on the fluid transfer of corporate assets. Purchasers would simply "investigat[e] the possible liability and negotiat[e] a purchase price," an indemnity provision, or a security bond "that would take it into account." *Full Circle Grp.*, 826 F.3d at 997; *see also Golden State Bottling v. NLRB*, 414 U.S. 168, 185 (1973). Here, Amstar's due diligence inquiries as to maintenance costs led to exactly such a negotiated purchase price.

In short, put on constructive notice, purchasers can account for withdrawal liability in an asset purchase. Indeed, as the Plan observes, of the three relevant parties to successor withdrawal liability—the seller, the purchaser, and the pension plan—purchasers are in the best position to ensure withdrawal liability is accounted for during an asset sale. Sellers have no incentive to disclose potential liabilities because "[s]uch liabilities are likely to drive the sale price in one direction only: down." Pension plans cannot be asked "to investigate sale[s] rumors, track down the identity of all potential purchasers, avoid confidentiality or contract interference concerns, and send notice of its (publicly-available) funding status directly to potential purchasers." Rather, pension plans are only responsible for "(1) determin[ing] the amount of the employer's withdrawal liability, (2) notify[ing] the employer of the amount of the withdrawal liability, and (3) collect[ing] the amount of the withdrawal liability from the employer." 29 U.S.C. § 1382. Purchasers, in contrast, have the incentive to inquire about potential withdrawal liability in order to avoid unexpected post-transaction liabilities.

A constructive notice standard would not create a strict liability standard for asset purchasers, as Amstar contends. Constructive notice would only exist when three conditions are met: (1) the purchaser qualifies as a successor; (2) the relevant pension plan is underfunded; and (3) a purchaser using reasonable care or diligence would have discovered the withdrawal liability. Additionally, successor liability would only be imposed when it is fair to do so. The fairness requirement stems from the fact that "the origins of successor liability are equitable," making "fairness [] a prime consideration in its application." *Resilient Floor*, 801 F.3d at 1091 (quoting *Sullivan*, 623 F.3d at 782). Even when the requirements for constructive notice are met, in certain instances fairness could militate against imposing successor liability.

In sum, congressional purpose, the liberal remedial construction of the MPPAA adopted in previous cases, the adoption of a constructive notice standard in other contexts, and the practical realities of asset purchases all support a conclusion that constructive notice of withdrawal liability is sufficient to trigger successor withdrawal liability under the MPPAA.

B

Applying a constructive notice standard in this case leads us to conclude that Amstar had constructive notice because a reasonable purchaser would have discovered Ohana's withdrawal liability.

Amstar previously operated a hotel that participated in a multiemployer pension plan, and, in prior acquisitions involving multiemployer pension plans, Amstar had required

its agents to determine whether it could incur withdrawal liability from the transactions. The Agreement plainly informed Amstar that the employees at Ohana were unionized and that Ohana had contributed to a multiemployer pension plan. Finally, the Plan's annual funding notices, which indicated a state of underfunding, were publicly available on the internet. These undisputed facts indicate that Amstar should have determined that, like most withdrawing employers, Ohana would incur withdrawal liability. *See Full Circle Grp.*, 826 F.3d at 997–98.

In these circumstances, a reasonable purchaser would have taken additional actions to determine if withdrawal liability existed. As the district court recognized, "[Amstar] could have [1] reviewed Plan documents publicly available on the internet, [2] asked Ohana to provide all Plan notices rather than rely on Ohana to parse whether the notices revealed unfunded liabilities, or [3] reached out to the Plan directly." Amstar also could have required Ohana to [4] request from the Plan "the estimated amount which would be the amount of such employer's withdrawal liability." 29 U.S.C. § 1021(l)(1)(A); *see also Tsareff*, 794 F.3d at 849 (noting that the successor employer could have required its predecessor "to obtain an estimate of [its] withdrawal liability" (citing 29 U.S.C. § 1021(l))). Any of these four reasonable actions would have revealed Ohana's withdrawal liability.

Ohana's failure to provide Amstar the deficiency notices required by the Agreement, and Ohana's representatives' statements that, "to their knowledge," the pension plan was not underfunded, do not change this conclusion. Allowing a seller's conduct to absolve a purchaser from responsibility for withdrawal liability conflicts with both a liberal construction

of the MPPAA and fairness where, as here, a purchaser can undertake simple steps to gain knowledge of the withdrawal liability. Notably, Amstar had a four-person due diligence team undertake various investigations prior to the sale's closing. The team "hire[d] engineers to . . . look at the roofs, look at the termites, look at the condition of all the structural [features] and give estimates on what it will take to fix it." As the Plan notes, Amstar did "not rely on the seller's representation regarding termites," but surprisingly did "rely on the seller's representation over a multimillion-dollar issue like withdrawal liability." This reliance is unreasonable.

Finally, Amstar's reliance on incorrect legal advice also does not render its conduct reasonable. The letter Amstar received from counsel stated that "[a]bsent an express assumption of liability, the Buyer does not assume the [withdrawal] liability." Even assuming, as the district court did, that it was not "entirely clear before the Ninth Circuit's *Resilient* decision in 2015 that the Ninth Circuit would follow the Seventh Circuit in applying successor liability in the context of MPPAA withdrawal liability," the legal advice was still incorrect. Accurate advice would have noted that law on this issue was lacking or unclear. Moreover, the application of successor liability in other ERISA contexts reveals a likelihood that this Court would hold successors liable for withdrawal liability, at least in certain circumstances. *See, e.g.*, *Haw. Carpenters Tr. Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 294–95 (9th Cir. 1987). Accordingly, Amstar cannot rely on this incorrect legal advice to justify its actions. *Cf. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." (internal quotations and citation omitted)).

For these reasons, we conclude that Amstar was on constructive notice of Ohana's withdrawal liability. Thus, we reverse the judgment of the district court. Given our resolution of this case, we need not—and do not—reach any other issue urged by the parties.

**REVERSED.**