**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 10, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    Plaintiff - Appellant,

v.

ROARK-WHITTEN HOSPITALITY 2,
LP, d/b/a Whitten Inn and Jai Hanuman,
LLC, d/b/a Whitten Inn Taos and/or El
Camino Lodge; SGI, LLC, d/b/a El
Camino Lodge,

    Defendants - Appellees.

No. 20-2023

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:14-CV-00884-PJK-LF)**
_____

Anne N. Occhialino, Senior Appellate Attorney (Sharon F. Gustafson, General Counsel,
Jennifer S. Goldstein, Associate General Counsel, and Elizabeth E. Theran, Assistant
General Counsel, with her on the briefs), Equal Employment Opportunity Commission,
Office of General Counsel, Washington, DC, appearing for Appellant.

Paul E. Frye (W. Gregory Kelly, with him on the brief), Frye & Kelly, P.C.,
Albuquerque, New Mexico, appearing for Appellee SGI, LLC.

Patrick J. Rogers, Patrick J. Rogers, LLC, Albuquerque, New Mexico, appearing for
Appellees Roark-Whitten Hospitality, 2, LP, and Jai Hanuman, LLC.

_____

Before **MATHESON**, **BRISCOE**, and **EID**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Plaintiff Equal Employment Opportunity Commission (EEOC) filed this action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 against defendant Roark-Whitten Hospitality 2 (RW2) seeking relief for what the EEOC alleged were unlawful employment practices by RW2 on the basis of race, color, national origin, and retaliation. Those unlawful employment practices allegedly occurred after RW2 purchased and began operating a hotel in Taos, New Mexico in 2009. The aggrieved employees were all employed at the hotel prior to RW2's purchase, and were all either terminated or constructively discharged at some point after the purchase. After the action was initiated, the EEOC filed amended complaints seeking to add as defendants two additional entities, Jai Hanuman, LLC (Jai), which purchased the hotel from RW2 in 2014, and SGI, LLC (SGI), which purchased the hotel from Jai in 2016.

The district court dismissed the EEOC's claims against SGI on the grounds that the EEOC failed to adequately allege a basis for successor liability against SGI. As for RW2 and Jai, the district court, acting pursuant to a motion for civil contempt filed by the EEOC, entered default judgment against them and then conducted a hearing on the issue of damages. After conducting that hearing, the district court dismissed the EEOC's claims against Jai on the grounds that the EEOC failed to adequately allege a basis for successor liability against Jai, and it ordered RW2 to pay compensatory damages to the EEOC in the total amount of $35,000.

2

The EEOC now appeals, raising two general issues.  First, the EEOC argues that the district court erred in dismissing its claims against defendants SGI and Jai.  Second, the EEOC argues that the district court erred in awarding only $35,000 in compensatory damages for the eleven aggrieved individuals.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the district court's dismissal of the EEOC's claims against defendant SGI, affirm the district court's dismissal of the EEOC's claims against defendant Jai, reverse the district court's damage award against defendant RW2, and remand for further proceedings.

I

In July 2009, RW2 acquired the Paragon Hotel in Taos, New Mexico, and renamed it the Whitten Inn.[1]  Although it is unclear from the record precisely what role Larry Whitten (Whitten) played in RW2, it appears to be undisputed that he was the effective owner of the Whitten Inn.  Whitten's business model was to purchase distressed hotels and then sell them for a profit.

At the time Whitten acquired the hotel in Taos, the hotel had several longtime Hispanic employees.  This included: Kathy Archuleta, the general manager of the hotel, who had worked at the hotel for eighteen years and had been general manager for ten years; Dale Quintana, who served as the hotel's maintenance manager and had worked at the hotel for approximately twenty-one years; and Jennie Valdez, who was

---

[1] Because this appeal arises from a default judgment that was entered against RW2, the facts that we outline in this opinion are derived from the allegations in the EEOC's second amended complaint against RW2.

3

the assistant housekeeping supervisor and had worked at the hotel for approximately twenty-four years.

On or about July 31, 2009, shortly after acquiring the hotel in Taos, Whitten met with the employees of the hotel. Whitten observed that nearly all of the employees were, in his words, "Spanish." Aplt. App., Vol. 1 at 26. Whitten informed the employees that many, if not most, of them would not make it as Whitten employees. Whitten also announced a new rule that employees of the hotel would not be allowed to speak Spanish in his presence. Whitten explained that the reason for the rule was because he did not understand Spanish.

Whitten set unreasonably short time periods for Valdez and the other Hispanic housekeepers to complete their duties. In contrast, the one Caucasian housekeeper who worked at the hotel was not expected to meet the same time standards that Whitten imposed on the Hispanic housekeepers.

Within a month after acquiring the hotel, Whitten fired or demoted three Hispanic employees who worked as front desk clerks. Specifically, in early August 2009, Whitten told employee Victor Cardenas that he could no longer work the front desk because of his accent, and Whitten directed Cardenas to instead work in maintenance and housekeeping. Also in early August 2009, Whitten told Marcos Jeantette, a light-skinned Hispanic male, that he needed to use the name "Mark" when he was at work. Jeantette refused to do so. On August 8, 2009, Whitten asked Jeantette if he was a "white boy." *Id*. at 29. Jeantette explained that his father was Hispanic. The next day, August 9, 2009, Whitten fired Jeantette. Lastly, Whitten

called Michelle Martinez, another of the Hispanic front desk clerks, "Buckwheat," in reference to her dark skin. *Id*. On August 16, 2009, Whitten fired Martinez.

Whitten also fired another Hispanic employee, Martín Gutierrez, on August 16, 2009. Gutierrez worked at the hotel as a night auditor. Whitten told Gutierrez that when he was at work he should pronounce his name as "Martin," without the Spanish accent on the last syllable. Whitten also told Gutierrez that he should not speak with an accent at work. Gutierrez objected to Whitten's no-Spanish policy. Whitten responded by terminating Gutierrez's employment.

On August 17, 2009, Kathy Archuleta, Dale Quintana, Jennie Valdez, and Victor Cardenas called a meeting with Whitten to object to what they perceived as discriminatory policies and treatment. At the conclusion of the meeting, Whitten fired Archuleta, Quintana, Valdez, and Cardenas. Although Whitten advised Valdez that she could re-apply, she did not do so. Following the meeting, Whitten rescinded the termination of Cardenas and allowed him to continue working in the maintenance/housekeeping department. Cardenas subsequently resigned his employment on September 14, 2009.

On August 30, 2009, Rebecca del Palacio, who had been employed by the hotel for over eight years and who worked as an executive housekeeper, was informed that her wages would be reduced. Del Palacio resigned in response.

By September 14, 2009, all but one of the Hispanic employees who were present at the initial meeting on July 31, 2009, had been fired or had resigned.

5

Aside from terminating the employment of multiple Hispanic employees, Whitten treated Hispanic hotel employees differently from Caucasian hotel employees. For example, shortly after acquiring the Whitten Hotel, Whitten required all Hispanic employees at the Taos hotel to park on the far perimeter of the front parking lot, but allowed the one Caucasian housekeeper to park closer to the hotel. Whitten allowed Caucasian employees to use the hotel pool, but minority employees were not allowed to do so. Whitten also allowed Caucasian employees to bring their children to work, but did not allow Hispanic employees to do so.

Whitten made offensive racial and ethnic comments in the workplace. Those included:

- Referring to Hispanic housekeepers who could not speak English as "wetbacks";

- Referring to African Americans, including a hotel maintenance employee, as "niggers";

- Saying, after firing several Hispanic housekeepers, that he was "glad to get rid of all the Mexicans";

- Calling a Hispanic employee "Paco" or "Sancho" rather than the employee's real name;

- Calling Michelle Martinez "Buckwheat."

*Id.* at 31.

Whitten also engaged in other acts that were perceived by his employees to be racist in nature. For example, he paid several Hispanic employees their final wages in the form of rolled pennies. On at least one occasion, Whitten discarded applications based

6

solely on the applicant's race, color, or ethnicity. And on at least one occasion, Whitten told hotel employees not to rent rooms to Black and Hispanic customers.

In May 2014, defendant Jai Hanuman, LLC (Jai) purchased the Whitten Inn from RW2 and renamed it the El Camino Lodge. Approximately two years later, on September 9, 2016, defendant SGI, LLC (SGI) purchased the hotel from Jai. *Id*. at 121 (purchase agreement).

II

Eight former employees of the hotel filed charges of discrimination with the EEOC alleging Title VII violations. By letter dated July 11, 2013, the EEOC sent notice of its reasonable-cause determinations to RW2 and other related entities.

On September 30, 2014, the EEOC filed a complaint against RW2 in federal district court on behalf of several individuals alleging discrimination based on race, color, and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. More specifically, the complaint alleged that RW2 subjected the aggrieved individuals to a hostile work environment and disparate treatment, and then fired or constructively discharged them after they protested the discriminatory treatment.

Not long after it filed its complaint, the EEOC learned that RW2 had sold the hotel to another entity. Consequently, on December 22, 2014, the EEOC filed an amended complaint adding as a defendant "[t]he unknown owner and/or XYZ Company(s)/Corportaions [sic]." ECF No. 4 at 2. In August 2016, after learning that Jai was the purchaser, the EEOC moved and was granted leave to file a second

7

amended complaint in order to substitute Jai for "the previously unknown XYZ Company(s)/Corporation(s)." ECF No. 52 at 1. Jai moved to dismiss the claims against it pursuant to Rule 12(b)(6), arguing that "imposing successor liability on [it] [wa]s a claim for which no relief c[ould] be granted" because it was "no longer the owner of the property/hotel." ECF No. 96 at 5. The district court denied Jai's motion. In doing so, the district court concluded that "the EEOC pleaded plausible factual allegations of successor employer liability against Jai, and thus stated a claim of successor employer liability." ECF No. 178 at 10. The district court also concluded that Jai's sale of the hotel did not prevent certain forms of relief being granted against Jai, "including (at least) lost wages and benefits during the period Jai owned the hotel." *Id*. at 12.

In late 2016, the EEOC determined that Jai sold the hotel to SGI, LLC (SGI). The EEOC responded by moving to amend the complaint to add SGI as a defendant. The district court granted the EEOC's motion and the EEOC filed its third amended complaint, which added SGI as a defendant.

In August 2017, counsel for RW2 and Jai moved to withdraw from the case. The magistrate judge assigned to the case held a hearing on the motion, during which counsel for RW2 and Jai "explained that he had not been in contact with RW2 since July of 2017," "had not communicated with . . . Whitten since June of 2017," and "that Jai did not oppose his motion to withdraw." ECF No. 187 at 2. The magistrate judge granted the motion to withdraw, but ordered "that new counsel must enter an appearance on behalf of defendant RW2 and defendant Jai no later than October 2,

8

2017," and that "[d]efendants' failure to obtain new counsel by October 2, 2017, m[ight] result in sanctions, up to and including a recommendation to the district judge to enter default judgment against them." ECF No. 177 at 2. The magistrate judge also ordered that after RW2 and Jai obtained new counsel, Whitten and David Patel, the principal of Jai, should be deposed within two months and that outstanding discovery responses should be supplemented by RW2 and Jai. *Id.*

RW2 and Jai failed, however, to obtain new counsel by October 2, 2017. On October 6, 2017, the EEOC filed a motion for civil contempt based on this failure, as well as upon what the EEOC alleged was "a pattern of delay" on the part of defendants that "result[ed] in a series of extensions of the discovery and pretrial deadlines." ECF No. 181 at 1. The EEOC argued in its motion that "[d]efault judgment [wa]s appropriate." *Id.* On October 12, 2017, Whitten submitted a letter to the district court stating that he and RW2 "[we]re totally without funds" and that they "ha[d] been unable to find legal counsel that [we]re willing to work for them without the appropriate funding." ECF No. 183 at 1. Whitten offered to settle the case "in the amount of $5,000.00 to the original 7 plaintiffs for a total of $35,000.00." *Id.*; *see* Aplt. App., Vol. 1 at 161 (Whitten letter to the EEOC). On October 27, 2017, Patel called the district court's chambers to inform the court that Jai had been unable to retain a lawyer. ECF No. 187 at 3. Neither RW2 nor Jai formally opposed the EEOC's motion for civil contempt.

The district court referred the EEOC's motion for civil contempt to the magistrate judge for initial consideration. On November 2, 2017, the magistrate

9

judge issued proposed findings and a recommended disposition regarding the EEOC's motion. ECF No. 187. The magistrate judge considered the five factors outlined by this court in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) and concluded: (1) "Defendants RW2 and Jai's failure to retain replacement counsel ha[d] prejudiced the EEOC by causing considerable delay"; (2) "[t]he amount of interference with the judicial process [wa]s also substantial" and the "case essentially ha[d] been stayed by RW2 and Jai's failure to obtain counsel by the deadline set by the Court"; (3) "[t]he fault of failing to comply with the Court's order to obtain counsel and comply with the discovery demands of th[e] case [lay] with RW2 and Jai" because "Whitten's failure to comply with the Court's order to obtain counsel [wa]s a willful violation, rather than involuntary noncompliance," and "Jai . . . offered no explanation for its failure to comply with the Court's order, and the Court interpret[ed] its silence as a willful refusal to comply"; (4) "RW2 and Jai were specifically warned in advance that default judgment could result from their failure to obtain counsel"; and (5) "[a] lesser sanction, such as a monetary sanction or striking certain defenses, would not be effective in this case." *Id*. at 6–10. The magistrate judge "therefore recommend[ed] that the Court enter default judgment against RW2 and Jai for failing to comply with the Court's order to obtain counsel and participate in discovery." *Id*. at 11. Neither RW2 nor Jai filed objections to the magistrate judge's report and recommendation.

On November 30, 2017, the district court adopted the magistrate judge's report and recommendation, granted "[t]he EEOC's request for an order for default

judgment against" RW2 and Jai, and noted that it would set "[a] hearing under Rule 55(b)(2) for the purpose of determining the amount of damages for which [RW2 and Jai] [we]re liable, and whether any injunctive relief [wa]s appropriate." Aplt. App., Vol. 1 at 52–53.

Meanwhile, SGI moved to dismiss the EEOC's third amended complaint on the grounds that the EEOC failed to adequately plead the essential elements necessary to establish successor liability, including that SGI had notice of the lawsuit at the time it purchased the hotel. ECF No. 186 at 2. On July 30, 2018, the district court granted SGI's motion, but ordered that the EEOC could file a fourth amended complaint against SGI on or before August 13, 2018, "to rectify the sole deficiency in the Complaint: the failure to allege that SGI had notice of the pendency of the EEOC charges in this case prior to its acquisition of the [hotel]." ECF No. 199 at 1.

On August 13, 2018, the EEOC filed its fourth amended complaint. SGI immediately moved to dismiss the fourth amended complaint under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. SGI argued in its motion that the fourth amended complaint failed to "allege either actual or constructive notice sufficient to establish 'successor jurisdiction.'" Aplt. App., Vol. 1 at 77. On August 20, 2019, the district court issued a memorandum opinion and order granting SGI's motion and dismissing the fourth amended complaint. The district court agreed with SGI that the fourth amended complaint "d[id] not sufficiently allege that SGI had actual or constructive notice of the pending EEOC claim when it purchased

11

the Taos Hotel from Jai and therefore d[id] not support a claim of successor liability." *Id*. at 136.

On August 23, 2019, the district court notified the parties that it had scheduled a default hearing against RW2 and Jai for October 3, 2019. The district court's notice authorized the EEOC, RW2, and Jai to simultaneously "file prehearing briefs not to exceed ten pages." ECF No. 216 at 1. The EEOC argued in its prehearing brief that, "[p]ursuant to Fed. R. Civ. P. 55(b)(2), the hearing . . . [wa]s limited to a determination of what damages and relief, if any EEOC and the eight Charging Parties and three aggrieved individuals [we]re entitled to because of Defendants' discriminatory conduct upon which default judgment was ordered . . . ." Aplt. App., Vol. 1 at 145. The EEOC asked the district court "to award $600,760.38 in back pay and prejudgment interest for the eight individuals with back pay losses through September 30, 2019." *Id*. at 148. The EEOC also argued that the eleven aggrieved individuals were entitled to compensatory damages "for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses," and it "present[ed] declarations from each of the eleven aggrieved individuals describing" their losses. *Id*. The EEOC requested the district court to "award . . . at least $45,454.54 per claimant for a total of $500,000.05 in compensatory damages for distribution among the eleven aggrieved individuals." *Id*. at 149.

RW2 and Jai, in their prehearing brief, argued that "[d]ismissal [wa]s appropriate, even after the default determination concerning liability." *Id*., Vol. 2 at

172. In particular, they argued that "dismissal of Jai [wa]s . . . appropriate because the EEOC . . . failed to adequately allege Jai as a 'successor' company." *Id*. at 173. They also argued, relatedly, that despite the district court's entry of default judgment, it remained for the district court to consider whether the unchallenged facts alleged in the EEOC's second amended complaint "constitute[d] a legitimate cause of action." *Id*. at 178 (quotation marks omitted).

At the default hearing on October 3, 2019, all parties were represented by counsel. Counsel for Jai argued, in pertinent part, "that it would be grossly unfair to impose successor liability on an innocent purchaser," and that Jai "[wa]s an innocent purchaser." *Id*. at 277. Counsel for Jai further argued that "[t]here [we]ren't sufficient allegations against Jai . . . for successor liability." *Id*. at 278. The EEOC argued, in response, that the issue "was already litigated" and noted in support that the district court had stated in its written order denying Jai's motion to dismiss the second amended complaint that "the EEOC adequately pled successor liability as to Defendant Jai." *Id*. at 288. The EEOC further argued that "Jai had 14 days" following that order "to actually file an answer to the second amended complaint," but that it "never filed an answer to the [second amended] complaint." *Id*. As a result, the EEOC argued, "all the allegations in the [second amended] complaint as to . . . Jai should be admitted" pursuant to "Rule 8(b)(6)." *Id*. The EEOC also noted that Jai did not "file[] any motion, 12(b)(6), anything like that, that could have been done in the one-year period of time which they had under Rule 60," and that "under Rule 60, there [wa]s no method to refile or ask the Court to reconsider default

judgment unless [there were] extraordinary circumstances." *Id*. at 290. In addition, the EEOC noted that Jai's previous counsel obtained "a protective order" that prevented Patel, the principal of Jai and the person alleged by the EEOC to have notice of the EEOC's lawsuit on behalf of Jai, from being deposed until Jai obtained new counsel. *Id*. at 291. The district court concluded the hearing and took the matter under advisement.

On December 30, 2019, the district court issued written findings of fact and conclusions of law following the default hearing. *Id*. at 298. In the "Findings of Fact" section of its decision, the district court outlined the amount of backpay sought by the EEOC on behalf of eight of the aggrieved individuals, but "decline[d] to award backpay" to any of these individuals due to what it concluded were issues with "the sources of the underlying data." *Id*. at 306–07.

In the "Conclusions of Law" section of its decision, the district court began by addressing the EEOC's claim against Jai. The district court noted that "[a] defaulting defendant admits a complaint's well-pleaded allegations, but not legal conclusions," and that "there must be a sufficient basis in the pleadings to support the judgment." *Id*. at 308. The district court further noted that "[i]f a plaintiff's claims would be barred or dismissed on a Rule 12(b)(6) motion, it cannot be the basis of a default judgment." *Id*. After outlining those principles, the district court dismissed the EEOC's claims against Jai because, it concluded, the second amended complaint "simply d[id] not state a plausible claim against Jai as to successor liability on the notice element, i.e., that Jai as a successor had notice of the charges." *Id*. at 308–09.

14

The district court then turned to the EEOC's claim against RW2 and the EEOC's request for compensatory and punitive damages against RW2. The district court characterized "the gravamen of the case" against RW2 as "a 'No Spanish' policy allegedly implemented by . . . Whitten." *Id*. at 310. The district court in turn stated that "a case of business necessity" for the "No Spanish" policy "seem[ed] obvious" because "no one contend[ed] that . . . Whitten did not have a business necessity to understand what his employees were saying." *Id*. at 311–12. The district court then stated:

> In light of the relatively short time frame in which the actions occurred given the abrupt end of the relationship between Mr. Whitten and the charging parties and aggrieved employees, and the stated basis of the gravamen of the [second amended complaint], the court will award $35,000 to be distributed by the EEOC.

*Id*. at 312. The district court "decline[d] to award punitive damages" or "injunctive relief." *Id*.

The district court entered final judgment on that same day (December 30, 2019). The EEOC filed a timely notice of appeal.

### III

The EEOC raises two issues on appeal. First, the EEOC argues that the district court erred in dismissing the EEOC's claims against defendants Jai and SGI due to a purported failure to state a claim of successor liability on notice grounds. Second, the EEOC argues that the district court erred in awarding only $35,000 in compensatory damages for the eleven aggrieved individuals. We proceed to address these issues in turn.

15

*The dismissal of defendants Jai and SGI*

The EEOC argues that the district court erred in dismissing its claims of successor liability against defendants SGI and Jai pursuant to Rule 12(b)(6) for failure to state a claim. We review de novo a district court's decision to dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim. *Smallen v. The Western Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (quotation marks omitted).

a) *Successor liability in Title VII cases*

In order to assess the sufficiency of the EEOC's claims of successor liability against SGI and Jai, it is necessary to first review the standards that this court has adopted for imposing liability on successor corporations. The longstanding common law rule outside of the Title VII context has been that "where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for

16

the debts and liabilities of the transferor." *W. Tex. Ref. & Dev. Co. v. Comm'r of Internal Revenue*, 68 F.2d 77, 81 (10th Cir. 1933) (citing federal and state cases). There are "four well recognized exceptions" to this general common law rule. *Id.* Those include: "(1) [w]here the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporations; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts." *Id.*

In the 1960's, federal courts began recognizing "that th[is] general common law rule of nonliability on the part of successors [wa]s too harsh to employees for application in the context of discrimination in employment, and that the traditional common law exceptions to the nonliability rule insufficiently ease[d] the harshness." *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986); *e.g.*, *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 548 (1964) (holding "that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, . . . the successor employer may be required to arbitrate with the union under the agreement").

17

Consequently, federal courts began adopting what is now commonly known as the

"successor employer doctrine" in the context of labor and Title VII claims.[2]

In 1982, we expressly recognized the application of the "successor employer

doctrine" in the context of Title VII claims. More specifically, in *Trujillo v.*

*Longhorn Mfg. Co., Inc.*, 694 F.2d 221 (10th Cir. 1982), we adopted the Sixth

Circuit's so-called *MacMillan* factors for "analyzing a successor corporation's

liability under Title VII." *Id*. at 225 (citing *E.E.O.C. v. MacMillan Bloedel*

*Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974)).

In *MacMillan*, the Sixth Circuit concluded "that the considerations set forth by

the Supreme Court . . . as justifying a successor doctrine to remedy unfair labor

practices are applicable equally to remedy unfair employment practices in violation

of Title VII." 503 F.2d at 1090. But, the Sixth Circuit emphasized, [e]ach case . . .

must be determined on its own facts," and there must be "a balancing of the purposes

of Title VII with the legitimate and often conflicting interests of the employer and the

discriminatee." *Id*. at 1090–91. To accomplish this goal, the Sixth Circuit outlined a

set of guiding principles for analyzing each unique case. To begin with, the Sixth

Circuit "emphasize[d] that the liability of a successor is not automatic, but must be

determined on a case by case basis." *Id*. at 1091. The Sixth Circuit in turn adopted

---

[2] For a more thorough discussion of the evolution of the successor employer liability in the labor context, see the Sixth Circuit's discussion in *Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 550–54 (6th Cir. 2006) (FMLA case).

from the unfair labor practices context the following nine factors for determining

whether a successor employer should be held liable under Title VII:

> 1) whether the successor company had notice of the charge, 2) the
> ability of the predecessor to provide relief, 3) whether there has been a
> substantial continuity of business operations, 4) whether the new
> employer uses the same plant, 5) whether he uses the same or
> substantially the same work force, 6) whether he uses the same or
> substantially the same supervisory personnel, 7) whether the same jobs
> exist under substantially the same working conditions, 8) whether he
> uses the same machinery, equipment and methods of production and
> 9) whether he produces the same product.

*Id*. at 1094.

Some courts have concluded that "[f]actors (4) through (9) are best considered as

sub-parts of factor (3)." *Brown v. Evening News Ass'n*, 473 F. Supp. 1242, 1245 (E.D.

Mich. 1979). As a result, some other circuits, as well as some district courts in this

circuit, have distilled the nine *MacMillan* factors into three factors: (1) whether the

successor had prior notice of the claim against the predecessor; (2) whether the

predecessor is able, or prior to the purchase was able, to provide the relief requested; and

(3) whether the predecessor and successor engaged in continuous business operations.[3]

*E.g., Wheeler*, 794 F.2d at 1236; *Walker v. Faith Techs., Inc.*, 344 F. Supp. 2d 1261, 1267

(D. Kan. 2004).

When we first adopted the *MacMillan* factors in *Trujillo*, we noted that "the

'nature and extent of [successor] liability is subject to no formula, but must be

determined upon the facts and circumstances of each case.'" 694 F.2d at 225 (quoting

---

[3] The Sixth Circuit has adopted its own unique three-factor test for purposes of
FMLA cases. *See Cobb*, 452 F.3d at 550–56.

*MacMillan*, 503 F.2d at 1092) (alteration in original).  Other circuits, however, have since

held that the first two *MacMillan* factors are of particular importance.  For example, the

Seventh Circuit has held:

> The first two factors identified in *MacMillan* are critical to the imposition
> of successor liability. The successor doctrine is derived from equitable
> principles, and it would be grossly unfair, except in the most exceptional
> circumstances, to impose successor liability on an innocent purchaser when
> the predecessor is fully capable of providing relief or when the successor
> did not have the opportunity to protect itself by an indemnification clause in
> the acquisition agreement or a lower purchase price.

*Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985).

In the case at hand, the EEOC effectively asks us to reject the Seventh Circuit's

position, arguing that  "successor liability can be imposed even in the absence of notice."

Aplt. Br. at 39.  We decline to do so.  In our view, the Seventh Circuit's position in

*Musikiwamba* is entirely reasonable, and we agree that, absent "the most exceptional

circumstances," successor liability cannot be equitably imposed on a successor

corporation who has no actual or constructive knowledge of the claims against its

predecessor.[4]  760 F.2d at 750.

> b)  *Did the district court improperly apply a heightened pleading standard?*

The EEOC also argues that the district court improperly applied a heightened

pleading standard when it reviewed the EEOC's complaints and dismissed its claims

---

[4] We make no attempt in this case to define what "the most exceptional circumstances" might include because (a) the EEOC has alleged that both SGI and Jai had at least constructive notice of the EEOC's claims against RW2, and (b) the EEOC has not alleged any exceptional or unusual circumstances that might justify abandonment of the notice requirement.

against SGI and Jai for failing to adequately "plead a single factor," i.e., notice, "out of [the] multi-factor [*MacMillan*] inquiry used to determine successor liability." Aplt. Br. at 35. In support, the EEOC argues that the district court's "analysis contradicts" the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), "wherein the Supreme Court unanimously rejected the notion that complainants must plead facts establishing a prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in order to satisfy Rule 8(a)(2)." *Id*. at 35–36. In other words, the EEOC argues, "[t]he district court ran afoul of *Swierkiewicz* by turning the *MacMillan* factors for assessing successor liability into pleading requirements." *Id*. at 36. We disagree.

*Swierkiewicz* was an employment discrimination case in which the plaintiff alleged "that he had been terminated on account of his national origin in violation of Title VII of the Civil Rights Act of 1964, . . . and on account of his age in violation of the Age Discrimination in Employment Act of 1967 . . . ." 534 U.S. at 509. The district court dismissed the "complaint because it found that [the plaintiff] ha[d] not adequately alleged a prima facie case, in that he ha[d] not adequately alleged circumstances that support[ed] an inference of discrimination." *Id*. (quotation marks omitted) (second and third alterations in original). Plaintiff appealed and the Second Circuit "affirmed the dismissal, relying on its settled precedent, which require[d] a plaintiff in an employment discrimination complaint to allege facts constituting a prima facie case of discrimination under the framework set forth by [the Supreme] Court in *McDonnell Douglas*." *Id*. The Second Circuit "held that [plaintiff] had failed to meet his burden because his allegations

21

were insufficient as a matter of law to raise an inference of discrimination." *Id*. (quotation marks omitted).

The Supreme Court subsequently granted the plaintiff's petition for writ of certiorari "to resolve a split among the Courts of Appeals concerning the proper pleading standard for employment discrimination cases." *Id*. at 509–10. The question before the Court was "whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a prima facie case of discrimination under the framework set forth . . . in *McDonnell Douglas*." *Id*. at 508.

The Supreme Court reversed the Second Circuit's decision. In doing so, the Supreme Court explained that "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." *Id*. at 510. The Court also stated that "it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Id*. at 511. "For instance," the Court noted, "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case. *Id*. "Under the Second Circuit's heightened pleading standard," the Court noted, "a plaintiff without direct evidence of discrimination at the time of his complaint must plead a prima facie case of discrimination, even though discovery might uncover such direct evidence." *Id*. The Court concluded: "It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered." *Id*. at 511–12. Moreover, the Court concluded that

22

"imposing the Court of Appeals' heightened pleading standard in employment discrimination cases conflict[ed] with Federal Rule of Civil Procedure 8(a)(2), which provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id*. at 512. "This simplified notice pleading standard," the Court emphasized, "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id*. "Applying the relevant standard," the Court noted, the plaintiff's "complaint easily satisfie[d] the requirements of Rule 8(a) because it g[ave] respondent fair notice of the basis for p[laintiff's] claims" and the allegations "state[d] claims upon which relief could be granted under Title VII and the ADEA." *Id*.

Since *Swierkiewicz* was issued, the Supreme Court has issued two key decisions clarifying the pleading standards for a complaint. In *Twombly*, the Court held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citations omitted). "Factual allegations," the Court held, "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. (citations and footnote omitted). In reaching these conclusions, the Court emphasized that it was "not requir[ing] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

23

In *Iqbal*, the Court held that "the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  556 U.S. at 678  (quotation marks omitted).  "To survive a motion to dismiss," the Court held, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id*. (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" the Court held.  *Id*.  "Rule 8," the Court noted, "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Id*. at 678–79.

Unlike the *McDonnell Douglas* framework, which is an evidentiary standard that applies in only some employment discrimination cases, the *MacMillan* factors are, under Tenth Circuit law, applicable in all Title VII employment discrimination cases in which the plaintiff seeks to impose liability on a successor corporation.  Further, although the *MacMillan* factors are not pleading requirements, they are factors that are relevant to the determination of whether successor liability can be equitably imposed on a successor employer in a given situation.

Applying the *Twombly/Iqbal* pleading-standard principles to the case at hand, we conclude that the EEOC's complaints did not need to specifically allege all of the *MacMillan* factors in order to state a claim of successor liability against SGI or Jai.  At

24

the same time, however, it would not be enough for the EEOC to simply allege that SGI and Jai were responsible or liable as successor employers, or to generally allege that the successor employer doctrine applies in this case. Instead, the EEOC must allege facts that would support a plausible claim of successor liability against SGI and Jai in light of the *MacMillan* factors.

With this conclusion in mind, we now turn to address the EEOC's allegations against SGI and Jai and whether they are sufficient to survive a motion to dismiss.

### c) EEOC's claims against SGI

The EEOC's fourth amended complaint, in the introductory "NATURE OF THE ACTION" section, alleged, in pertinent part, that SGI was named as a defendant "in order to secure appropriate relief, including re-instatement, injunctive relief and other appropriate relief from the Taos Hotel." Aplt. App., Vol. 1 at 55. In the "PARTIES" section, the fourth amended complaint alleged, in pertinent part:

> 15. After this lawsuit was filed, and on or after October 5, 2014, Jai Hanuman LLC's registered agent, David "Dharmesh" Patel reported to news agencies that he was the new owner of the Taos Hotel. Through Patel, Jai Hanuman had notice of the Charges filed with the Commission that are the subject of this lawsuit.
>
> 16. Upon information and belief, Patel did not own the Taos Hotel as an individual; instead, he established Jai Hanuman, LLC, to purchase, own, and operate the Taos Hotel.
>
> * * *
>
> 27. After Plaintiff EEOC filed suit against the Whitten Inn Hotels on September 30, 2014, and after Plaintiff EEOC sought to amend to add Jai Hanuman as a defendant to this lawsuit in August 2016, the Taos Hotel was sold in 2016 to Defendant SGI.

25

28. Upon information and belief, Defendant SGI's predecessors, Jai Hanuman and Whitten Inn, are unable to provide certain relief in this lawsuit, including reinstatement, injunctive relief and other relief, that would involve the hotel in Taos, New Mexico now under new ownership by Defendant SGI.

29. Upon information and belief, since at least 2016, Defendant SGI has employed more than 15 employees.

30. Upon information and belief, since at least 2016, Defendant SGI has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

31. Upon information and belief, Defendant SGI has substantially continued the business operations of the Taos Hotel in Taos, New Mexico.

32. Upon information and belief, Defendant SGI has used and continues to use the hotel building at the same physical location as Defendant Whitten Inn at 615 Paseo del Pueblo Sur, Taos, New Mexico 87571.

33. Upon information and belief, Defendant SGI has jobs with substantially the same working conditions as those jobs that Defendants Whitten and Jai Hanuman had at all relevant times at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571.

34. Upon information and belief, Defendant SGI has utilized at least some of the same machinery and equipment as Defendants Whitten and Jai Hanuman utilized to operate the hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571.

35. Upon information and belief, Defendant SGI is involved in the business of operating a hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571 referred to as the Whitten Inn – Taos and/or El Camino Lodge. Defendant Whitten Inn and Defendant Jai Hanuman were also involved in the same business of operating a hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571 referred to as the Whitten Inn – Taos and/or El Camino Lodge.

a. On September 9, 2016 Defendant SGI executed a contract to purchase the Whitten Inn – Taos and/or El Camino Lodge from Defendant Jai Hanuman, which contract was accepted by Defendant Jai Hanuman on September 12, 2016.

b.  Paragraph 14 of the Purchase Agreement signed by SGI's principal, Russ Harper stated in relevant part, "It is understood and agreed that the Property is being sold 'as is' subject to the terms and conditions as outlines (sic) in paragraph 38, that the Buyer has, or will prior to the Closing Date, inspected the Property. . . 'Property Condition' means each and every matter of concern or relevant to Buyer related to the Property, including without limitation, the financial, legal, title . . . condition and sufficiency of the Property. . ." .

c.  In the second part of paragraph 14, of the Purchase Agreement, SGI warranted that it was purchasing the Property, "as is" and "solely on (sic) reliance on its own investigation of the Property." SGI was cautioned in this paragraph that the sale of the Property, upon the expiration of the due diligence period as outlined in Paragraph 38 of the Purchase Agreement, that as the Buyer, SGI "waives, releases, acquits, and forever discharges Seller . . . from any and all claims, actions, causes of action, demands, rights, liabilities, damages, losses, costs, expense, or compensation whatsoever, direct or indirect, known or unknown, foreseen or unforeseen, that it now has or which may arise in the future on account of or in any way growing out of or connected with Property Condition."

d.  Paragraph 38 of the purchase agreement between Defendant Jai Hanuman and Defendant SGI provided for a "due diligence" period for SGI to review the real estate, liabilities, operations and all of the business assets and equipment necessary to continue operating the Whitten Inn – Taos and/or El Camino Lodge.

e.  The sale of all assets by Defendant Jai Hanuman to Defendant SGI, included: "all 122 rooms of FF&E [furniture, fixtures and equipment], office, lobby furnishings, front desk equipment, supplies, PMS software and computers including any and all maintenance equipment, PTAC units, laundry equipment and washer dryer machines…reservations, phone numbers, trade name and domain names and … access codes to said domain, and web page at closing."

f.  Notice to Defendant SGI that it had a right to inspect the business operations of Defendant Jai Hanuman was provided for in Paragraph 8.1 of the purchase agreement. The purchase agreement indicated that the Defendant SGI had the sole discretion to inspect and review any and all documents which affect the property including the operating documents and credit reports of Defendant Jai Hanuman; and, if Defendant SGI

27

found anything objectionable, it could withdraw without penalty from the purchase.

g.  Prior to date of purchase of the Whitten Inn – Taos and/or El Camino Lodge business operations by Defendant SGI, and prior to the beginning of Defendant SGI's due diligence period under the purchase agreement, the present suit had been pending against the business known as Whitten Inn and filed of public record in the United States District Court for the State of New Mexico since December 2014.

h.  The President of Defendant SGI was experienced in the purchasing of hotels and aware the standard practice in the buying and selling of hotel properties provides for a due diligence period.

i.  The President of Defendant SGI describes the due diligence period as a time for the prospective buyer to go through the financials of the business, inspect the property and then make a final decision on whether to complete the sale or withdraw from the purchase without penalty as provided in the purchase agreement.

j.  As a result of the due diligence he did undertake, the President of Defendant SGI negotiated a three hundred-thousand-dollar amount to be set aside and/or returned to SGI as part of the purchase price for the necessary repairs once the sale of the Whitten Inn – Taos and/or El Camino Lodge was complete.

k.  In Defendant SGI's purchase of the Whitten Inn – Taos and/or El Camino Lodge business, the due diligence period was thirty days to review the business of Defendant Jai Hanuman and if it found anything not to SGI's satisfaction, the offer to purchase could be withdrawn without penalty.

l.  The President of SGI testified that at the time he executed the purchase agreement with Defendant Jai Hanuman, he was in a hurry to buy a property and did not complete a thorough review of the business during the due diligence period.

m.  As part of his due diligence, the President of Defendant SGI searched the internet for information about Whitten Inn – Taos and/or El Camino Lodge, but indicated he mainly looked at the customer reviews.

n.  The President of Defendant SGI admitted that he didn't search the internet for history for the past names of the hotel on Google, "Whitten

28

Inn Taos" or "El Camino Lodge"; and, he further admits it would not have taken him very long to do this type of search.

o. A simple search on Google for "Whitten Inn Taos" would reveal information about the EEOC's lawsuit and the underlying dispute with the employees.

p. Prior to Defendant SGI's purchase of the Whitten Inn – Taos and/or El Camino Lodge, the underlying EEOC charges upon which this lawsuit was based had long been filed by the former employees of the Whitten Inn and a lawsuit filed of public record.

q. The President of Defendant SGI has admitted he had the duty to act and perform his duty of due diligence under the terms of the contract; and he admits he could have discovered the fact of this pending EEOC lawsuit by proper diligence but was in a hurry to close the sale.

r. Defendant SGI had constructive notice of the EEOC's pending lawsuit against Defendants Whitten Inn and Jai Hanuman when it purchased the Whitten Inn – Taos and/or El Camino Lodge.

36. Defendant SGI is successor to Defendant Jai Hanuman and Defendant Whitten Inn as the new owner of the hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571 and is a party to this lawsuit under Fed. R. Civ. P. 19(a)(1)(A) in whose absence, the court cannot accord complete relief among existing parties.

*Id*. at 56–63. In sum, these allegations relied on constructive rather than actual notice for purposes of imposing successor liability on SGI. The question we must address is whether some or all of these allegations of constructive notice were sufficient under Fed. R. Civ. P. 8 to state a claim of successor liability against SGI.

There is, to be sure, little case law on the issue of constructive notice in the context of Title VII successor liability. We have never before addressed the issue and, as best we can determine, the only circuit that has discussed the issue to date is the Seventh Circuit. *Musikiwamba*, 760 F.2d at 755 (Eschbach, J., concurring)

29

(noting that the successor employer "must have had actual or constructive notice of the claim or charge of employment discrimination against the predecessor sufficiently in advance of the closing of the transaction to enable the successor to negotiate compensation for its exposure to the liability the plaintiff seeks to impose").  The Seventh Circuit has not, however, outlined precisely what constitutes constructive notice in this setting.

In other, relatively similar employment settings, we have analogized constructive notice to "a negligence standard."  *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 651 (10th Cir. 2013) (quotation marks omitted) (Title VII sexual harassment and retaliation).  This is because constructive notice focuses on whether the relevant circumstances were such that the defendant at issue should have, given all of the circumstances, been aware of the incidents in question.  *See id*. at 652.  The Ninth Circuit has likewise held, in a case brought under the Employee Retirement Income Security Act (ERISA), that "[u]nder a constructive notice standard, purchasers are deemed to have notice of any facts that 'one using reasonable care or diligence should have.'"  *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 845 (9th Cir. 2018) (quoting *Constructive Knowledge*, Black's Law Dictionary (10th ed. 2014)).

Of course, neither of these are perfect examples. As the dissent correctly notes, the defendant in *Debord* was the plaintiff's employer and not a successor corporation. And, as the Ninth Circuit discussed in *Heavenly Hana*, ERISA has its own unique parameters when it comes to successor liability.  But we nevertheless glean from

30

these cases that a defendant's failure to reasonably discover information can, depending upon the circumstances, including both the pertinent underlying facts and the nature of the claims at issue, be relevant to the issue of constructive notice. And, as we shall proceed to discuss, the allegations in the EEOC's fourth amended complaint effectively require us to determine whether a similar, although not identical, type of "failure to discover" standard should be recognized in the context of Title VII for purposes of constructive notice and successor liability.

The EEOC alleges in its fourth amended complaint that SGI voluntarily entered into a contract to purchase the property from Jai. SGI warranted in the contract that it was purchasing the property based solely on its own investigation. Relatedly, the contract included a due diligence provision that afforded SGI thirty days in which to investigate, in pertinent part, the liabilities of the business.[5] If, during the due diligence period, SGI "found anything not to [its] satisfaction," the contract allowed SGI to withdraw its purchase offer "without penalty." Aplt. App., Vol. 1 at 62. To allow SGI to conduct a complete investigation, the contract granted SGI the authority to inspect and review "any and all documents which affect[ed] the property." *Id*. at 61. The President of SGI, who was experienced in purchasing

---

[5] The district court concluded, in dismissing the EEOC's fourth amended complaint against Jai, that the allegations regarding SGI's duty to perform due diligence were limited to "liabilities concerning the parcel of land." Aplt. App., Vol. 1 at 140. Under the de novo standard of review that applies in this case, we disagree with the district court's conclusion and instead read the EEOC's allegations more broadly as indicating that SGI assumed the duty to investigate all of the liabilities associated with the business it was purchasing.

31

hotels, has "admitted he had the duty to act and perform his duty of due diligence under the terms of the contract." *Id*. at 62. But the President of SGI also admitted that he did not, due to his own haste, "complete a thorough review of the business during the due diligence period."[6] *Id*. Lastly, the President of SGI admitted "he could have discovered the fact of this pending EEOC lawsuit by proper diligence." *Id*.

Considered together, we conclude that these allegations, if proved by the EEOC, would establish that: (a) SGI bargained with Jai for a thirty-day due diligence period to allow itself to investigate the liabilities of the business; (b) had SGI conducted a reasonable and adequate investigation of those liabilities, it would have discovered the pendency of this lawsuit; (c) SGI failed to conduct a reasonable and adequate investigation; and (d) as a result, SGI failed to discover the pendency of this lawsuit. In our view, such proof would establish that SGI reasonably should have been aware of the EEOC's pending claims at the time of purchase. In other words, such proof would establish that a reasonable party in SGI's position would have discovered the pendency of, and thus had actual notice of, the EEOC's pending

---

[6] At this juncture, we place no weight on the EEOC's allegation that "[a] simple search on Google for 'Whitten Inn Taos' would reveal information about the EEOC's lawsuit and the underlying dispute with the employees," or its allegation that the President of SGI failed to conduct such a search. Aplt. App., Vol. 1 at 62. Indeed, we do not read the EEOC's fourth amended complaint as necessarily tying those allegations to the President of SGI's admissions that he "did not complete a thorough review of the business during the due diligence period" or "could have discovered the fact of this pending EEOC lawsuit by proper diligence." *Id*. at 62–63.

claims at the time of purchase. This, in our view, could be sufficient to establish constructive notice on the part of SGI for purposes of the *MacMillan* factors.[7]

Before addressing the EEOC's allegations of constructive notice against Jai, we must address a number of assertions made by the dissent regarding our conclusion that the EEOC has adequately alleged constructive notice on the part of SGI. To begin with, the dissent asserts that we are "wrong to define constructive notice without reference to specific facts putting a party on notice that it should inquire further." Dissent at 2. The dissent is mistaken. Our holding is narrowly confined to the EEOC's allegations against SGI, and, as noted, those allegations suggest that SGI knew it should inquire further into the potential liabilities associated with the hotel because it (a) negotiated for a due diligence period to afford itself time to conduct such an inquiry, and (b) actually took some, but by its own admission insufficient, steps toward conducting such an inquiry.

The dissent next asserts that we are "wrong to conclude that SGI voluntarily undertook [a] duty for the benefit of RW2's victims in this litigation, as opposed to its own benefit in the transaction with Jai." *Id*. at 3. Again, the dissent is mistaken. There is little doubt that SGI was acting for its own benefit—and indeed could not have been acting for the benefit of RW2's victims since it was apparently unaware of them—when it negotiated for a due diligence period to inquire further into the

---

[7] SGI argues that we can affirm the district court's dismissal of the EEOC's fourth amended complaint against SGI because the fourth amended complaint failed to sufficiently allege the other *MacMillan* factors. SGI Aple. Br. at 22-26. Because the district court did not reach this issue, we decline to do so in the first instance.

potential liabilities associated with the hotel. And had SGI discovered the EEOC's pending claims against the hotel, SGI presumably would have either declined to purchase the hotel or negotiated different terms to account for the potential liability it was assuming. But the key point, for purposes of constructive notice in this case, is simply whether, considering all of the circumstances, SGI reasonably should have known about the EEOC's pending claims at the time SGI completed the purchase of the hotel.[8] As we have discussed, the EEOC's allegations sufficiently allege that SGI reasonably should have known about the claims.

Further, the dissent criticizes the majority for ignoring evidence submitted by SGI regarding the steps that SGI's broker actually took in investigating the hotel and its liabilities, as well as that broker's declaration that internet searches are not a customary part of any such investigation. *Id*. at 10. But this criticism ignores the fact that we are tasked in this appeal with reviewing the district court's Rule 12(b)(6) dismissal of the EEOC's complaint against SGI. As a result, our sole focus is rightly on the allegations in the EEOC's complaint.

Perhaps most alarmingly, the dissent suggests that "the majority's result borders on imposing a freestanding and indeterminate duty of due diligence on all successors" given "the prevalence of due diligence clauses in purchase contracts." *Id*. at 12. This statement is simply incorrect. Our conclusion regarding the EEOC's

---

[8] The dissent appears to suggest that constructive notice requires that the defendant owe a duty to the plaintiffs. Neither *MacMillan* nor our case law applying *MacMillan* supports that position.

claim of successor liability against SGI is narrowly limited to the allegations that the EEOC has made against SGI in its complaint. To be sure, one of those allegations is that the contract between SGI and Jai included a thirty-day due diligence period to allow SGI to investigate the liabilities of the business. But the dissent overlooks the other allegations that are also key to our conclusion in this case: that SGI failed to conduct a reasonable and adequate investigation, and that had SGI conducted a reasonable and adequate investigation, it would have discovered the pendency of this lawsuit.

Finally, although the dissent criticizes our conclusion that the EEOC's allegations against SGI are sufficient to establish constructive notice, it fails to explain in any detail why constructive notice should not be found to exist where, as is alleged here, a defendant reasonably should have known about the pending claims. And, although the dissent purports to generally "agree that either actual or constructive notice may suffice," the dissent later states that "a successor is only on notice of what a hypothetically diligent investigation would reveal when it possesses information that suggests such an investigation is warranted in the first place." *Id*. at 2, 3. This seems to us to be perilously close to saying that only actual notice will suffice. Our case law, however, clearly establishes otherwise.

### d) EEOC's claims against Jai

We now turn to the claims asserted by the EEOC against Jai in the second amended complaint. As we have noted, the district court originally denied Jai's motion to dismiss those claims. But the district court revisited that ruling after

conducting the default judgment hearing, and it ultimately concluded the second amended complaint "d[id] not state a plausible claim against Jai as to successor liability on the notice element, i.e., that Jai as a successor had notice of the charges." Aplt. App., Vol. 2 at 308–09.

As a threshold matter, we note that the district court acted within its discretion in reconsidering its ruling on Jai's motion to dismiss the claims by the EEOC in the second amended complaint.[9] *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1225 (10th Cir. 2007) ("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders."). As the district court noted in doing so, the entry of a default judgment means that the "defendant admits to [the] complaint's well-pleaded facts and forfeits his or her ability to contest those facts." *Tripodi v. Welch*, 810 F.3d 761, 764 (10th Cir. 2016). In other words, the entry of a default judgment relieves the plaintiff "from having to prove the complaint's factual allegations." *Id*. at 765. But, "even in default, a defendant is not prohibited from challenging the legal sufficiency of the admitted factual allegations," and the default judgment "must be supported by a sufficient basis in the pleadings." *Id*.

---

[9] Three different judges presided over the district court proceedings, and, as a result, the district judge who presided over Jai's initial motion to dismiss the second amended complaint was different than the judge who conducted the default judgment hearing. Although it is questionable whether the EEOC was provided with notice prior to the default judgment hearing that the district court would revisit the adequacy of the EEOC's claims of successor liability against Jai in the second amended complaint, the EEOC has not raised that issue of notice on appeal.

Turning to the second amended complaint, the EEOC alleged, in the

introductory "NATURE OF THE ACTION" section, that defendant Jai "purchased

the Whitten Inn . . . in 2014" and "ha[d] been added to th[e] lawsuit pursuant to Fed.

R. Civ. P. 19(a)(1)(A) in order to secure appropriate relief, including re-instatement,

injunctive relief and other appropriate relief . . . ."  ECF No. 87 at 2.  In the

"PARTIES" section, the second amended complaint alleged, in pertinent part:

> 15.  After this lawsuit was filed, and on or after October 5, 2014, Jai
> Hanuman LLC's registered agent, David "Dharmesh" Patel reported to
> news agencies that he was the new owner of the Whitten Inn in Taos, New
> Mexico.  Through Patel, Jai Hanuman had notice of the Charges filed with
> the Commission that are the subject of this lawsuit.
>
> 16. Upon information and belief, Patel does not own the Whitten Inn in
> Taos, New Mexico as an individual; instead, he established Jai Hanuman,
> LLC, to purchase, own, and operate the Whitten Inn in Taos, New Mexico.
>
> 17. Jai Hanuman's predecessor Whitten Inn, is unable to provide certain
> relief in this lawsuit, including re-instatement, injunctive relief and other
> relief, that would involve the hotel in Taos, New Mexico now under new
> ownership by Jai Hanuman.
>
> 18. Upon information and belief, since 2014, Jai Hanuman has employed
> more than 15 employees.
>
> 19. Upon information and belief, since 2014, Jai Hanuman has
> continuously been an employer engaged in an industry affecting commerce
> within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C.
> §§ 2000e(b), (g) and (h).
>
> 20. Upon information and belief, Jai Hanuman has substantially continued
> the business operations of Whitten Inn located in Taos, New Mexico.
>
> 21. Upon information and belief, Jai Hanuman has used and continues to
> use the hotel building at the same physical location as Defendant Whitten
> Inn at 615 Paseo del Pueblo Sur, Taos, New Mexico 87571.

37

22. Upon information and belief, Jai Hanuman has employed at least some of the same work force and/or supervisory personnel as Defendant Whitten Inn employed at 615 Paseo del Pueblo Sur, Taos, New Mexico 87571.

23. Upon information and belief, Jai Hanuman has jobs with substantially the same working conditions as those jobs that Defendant Whitten Inn had at all relevant times at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571.

24. Upon information and belief, Jai Hanuman utilized at least some of the same machinery and equipment as Defendant Whitten Inn utilized to operate the hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571.

25. Upon information and belief, Jai Hanuman is involved in the business of operating a hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571 referred to as the Whitten Inn – Taos and/or El Camino Lodge. Defendant Whitten Inn, prior to the 2014 sale, was also involved in the same business of operating a hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571 referred to as the Whitten Inn – Taos.

26. Jai Hanuman is successor to Defendant Whitten Inn as the new owner of the hotel at 615 Paseo del Pueblo Sur, Taos, New Mexico, 87571 and is a party to this lawsuit under Fed. R. Civ. P. 19(a)(1)(A) in whose absence, the court cannot accord complete relief among existing parties.

*Id*. at 4–5.

The district court, in dismissing the EEOC's claim of successor liability against Jai, focused on the allegations in paragraph 15, i.e., the first sentence stating that, after the EEOC filed its action against RW2, David Patel reported to news agencies that he was the owner of the hotel and the second sentence stating that Jai, through David Patel, "had notice" of the EEOC's charges. Specifically, the district court stated: "The fact that Jai's registered agent [Patel] merely reported to news agencies that he was the new owner of the Whitten Inn does not create any inference (let alone a reasonable one) that he (and in turn Jai) had notice of the charges." Aplt. App., Vol. 2 at 310.

38

In conducting our own de novo review of the second amended complaint, we note at the outset that the sufficiency of the EEOC's claims against Jai hinges on how specific an allegation of notice on the part of a successor corporation must be in order to satisfy Rule 8. The second amended complaint, as we have noted, alleged in paragraph 15 that Jai, "[t]hrough Patel," its registered agent, "had notice of the Charges filed with the Commission that are the subject of this lawsuit." ECF No. 87 at 4. That is, to be sure, an allegation of fact and not a conclusion of law. But it is, at the same time, threadbare and conclusory in nature. *See Iqbal*, 556 U.S. at 678.

The phrase "had notice" seems to us to suggest that Patel had actual notice of the EEOC's charges against RW2. But the EEOC eschews any reliance on actual notice and instead argues only that the phrase "plausibly pleads that Jai had constructive notice of the charges." Aplt. Br. at 26. More specifically, the EEOC argues that the facts alleged in paragraph 15, "and the reasonable inferences to be drawn from them, plausibly suggest that Patel could have discovered the eight pending EEOC charges, as well as the [EEOC's] reasonable cause finding, and failure of conciliation notice, had he asked Whitten about any outstanding liabilities." Aplt. Br. at 47. "At a minimum," the EEOC argues, "it is plausible that an internet search using the hotel's name would have alerted [Patel] to the employees' widely publicized allegations of discrimination and retaliation." *Id*. And "[t]his," the EEOC argues "satisfies the due diligence standard" and suffices to allege constructive notice on the part of Jai. *Id*.

The EEOC may well be correct that an internet search using the hotel's name would have alerted Patel to the EEOC's claims. But there are no allegations in the

39

second amended complaint that could reasonably lead to the conclusion that Patel should have, but failed to, conduct such an internet search. Nor are there any other factual allegations, as there are with respect to SGI, that Patel and/or Jai failed to exercise due diligence in discovering the pendency of the EEOC's claims or had a purchase agreement that included a due diligence clause. Instead, as we have noted, the only allegation regarding notice, contained in paragraph 15, simply states in conclusory fashion that Patel "had notice" of the EEOC's claims.

We thus conclude that the allegations in Paragraph 15 are insufficient, in light of the pleading standards outlined in *Twombly* and *Iqbal*, to allege constructive notice on the part of Jai. We therefore affirm the district court's dismissal of the EEOC's claims against Jai. [10]

*The compensatory damage award*

In its second issue on appeal, the EEOC argues that the district court erred in awarding only $35,000 in compensatory damages to the eleven aggrieved individuals. Aplt. Br. at 52. "That minimal award," the EEOC argues, "was so low as to constitute an" error on the part of the district court. *Id*. In support, the EEOC notes

---

[10] The EEOC argues in its opening brief that "if this Court concludes that the [second amended] complaint did not plausibly allege notice, the EEOC should be permitted to amend it." Aplt. Br. at 49. We conclude that option is foreclosed, however, due to the EEOC's failure to ask the district court for leave to amend, which the EEOC could have done after the district court issued its written findings of fact and conclusions of law and entered judgment on December 30, 2019. More specifically, the EEOC could have, but failed to, move to amend simultaneously with a motion under Rule 59 to alter or amend the judgment, or a motion under Rule 60 for relief from the judgment.

that "[a]t the Rule 55(b) hearing," it "offered unrebutted evidence of the significant emotional—and even physical—harm the discrimination and retaliation caused the eleven aggrieved individuals." *Id*. at 53. "That evidence," the EEOC argues, "warranted a compensatory damage award far higher than $35,000 (averaging only $3,181 per individual), making the award an abuse of discretion." *Id*. Further, the EEOC notes that "[t]he district court offered no explanation for how it settled on $35,000, although that happens to be exactly what Whitten offered to settle the case in 2017." *Id*. "However the district court arrived at this figure," the EEOC argues, "it fell woefully short of compensating the eleven aggrieved individuals for the emotional distress inflicted by Whitten's treatment." *Id*. at 53–54.

We review a district court's award of noneconomic damages for clear error, to determine whether the award shocks the judicial conscience. *Stokes v. United States*, 967 F.3d 1034, 1044 (10th Cir. 2020). "This standard," we have noted, "is difficult to meet" because "trial courts are vested with broad discretion in awarding damages, and we do not lightly engage in a review of a trial court's actions." *Id*. (quotations and brackets omitted).

A complaining party in an action for intentional employment discrimination "may recover compensatory and punitive damages." 42 U.S.C. § 1981a(a)(1). "The sum of the amount of compensatory damages awarded . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded" depends upon the size of the respondent employer. *Id*. § 1981a(b)(3). For an

41

employer such as RW2, which had "more than 14 and fewer than 101 employees,"

the statutory cap is $50,000 "for each complaining party." *Id.* § 1981a(b)(3)(A).

Prior to the default hearing before the district court, the EEOC submitted a

prehearing brief that outlined its position on damages. The EEOC argued, in

pertinent part, that the eleven aggrieved individuals were entitled to compensatory

damages "for emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life and other nonpecuniary losses suffered" as a result of the

discriminatory conduct. Aplt. App., Vol. 1 at 148. In support of that request, the

EEOC "present[ed] declarations from each of the eleven aggrieved individuals

describing the emotional distress, emotional pain, suffering, loss of enjoyment of life,

and other compensatory damages caused by the discriminatory actions of the

Defendants."[11] *Id.* The EEOC asked the district court to "award . . . at least

---

[11] For example, Jose Quintana stated in his declaration that he "went through a huge depression after being terminated by Larry Whitten" and also "suffered from anxiety and was placed on Xanax and ha[s] since continued on the medication for [his] anxiety to this day." Aplt. App., Vol. 1 at 165. Quintana also stated that he "began having great difficulty sleeping because [he] was always worried about money," and his termination "caused [him] financial issues." *Id.* Quintana stated that "[i]nitially [he] felt bad about [him]self and [his] self-esteem was very low, and [he] [was] just now beginning to let go." *Id.*

As another example, Maria Tafoya stated in her declaration that she "had lived and worked at the hotel, so when Larry Whitten fired [her] [she] became homeless on the spot, losing everything as well as [her] self-respect and [her] dignity." *Id.* at 171. Tafoya further stated that shortly after her termination, she "developed an anger problem [she] could not manage," and also developed "anxiety attacks" and "suicidal thoughts." *Id.* Since her experience with Whitten, Tafoya stated, "[i]t seems like [she] see[s] and feel[s] discrimination everywhere," and she "began to see [her]self as ugly, fat and just not good enough" and she continues to "struggle with these thoughts and feelings." *Id.*

$45,454.54 per claimant for a total of $500,000.05 in compensatory damages for distribution among the eleven aggrieved individuals." *Id*. at 149.

At the default hearing, the EEOC's counsel asked the district court to award $50,000 in compensatory damages "per individual." *Id*., Vol. 2 at 250. The EEOC's counsel also argued that if the district court "decide[d] not to award individually compensatory damages based on the individual's testimony, . . . the award [should] be allotted to the EEOC to make that determination based on tiers or levels of harm that the EEOC thinks is appropriate that the 11 aggrieved individuals should receive." *Id*. In addition, the EEOC's counsel noted that neither RW2 nor Jai "ha[d] raised any type of defenses as to any of these damages." *Id*. at 252. As a result, the EEOC's counsel explained, the EEOC was "standing on the declarations" that it submitted by the eleven individuals. *Id*. at 254.

The district court, in its written decision, offered the following conclusions of law relevant to its award of compensatory damages:

> 26. The [second amended complaint] alleges that Mr. Whitten used racial epithets, ridiculed an employee's accent, treated Hispanic and Black employees and customers poorly, and otherwise treated the employees of color differently from White employees. SAC ¶¶ 78–83 (ECF No. 87).

> 27. The court has considered the EEOC's request for compensatory and punitive damages. The [second amended complaint] and charging documents make it clear that the policy announced by Mr. Whitten was that Spanish was not to be spoken in his presence for which a case of business necessity seems obvious — no one contends that Mr. Whitten did not have a business necessity to understand what his employees were saying. *See*

---

All of the declarations set forth similar, post-termination complaints of stress, anxiety, shame, humiliation, and relationship problems.

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1171 (10th Cir. 2007); 29 C.F.R. § 1606.7(b).

28.  In light of the relatively short time frame in which the actions occurred given the abrupt end of the relationship between Mr. Whitten and the charging parties and aggrieved employees, and the stated basis of the gravamen of the [second amended complaint], the court will award $35,000 to be distributed by the EEOC.  Hr'g Tr., Oct. 10, 2019, at 19–20.

Aplt. App., Vol. 2 at 311–12.

We conclude that the district court's damage award is problematic for a number of reasons.  To begin with, it is simply unclear from the record how the district court arrived at the $35,000 total compensatory damage figure.  Although the district court obviously, albeit implicitly, rejected the EEOC's request for an award of "at least $45,454.54 per claimant for a total of $500,000.05 in compensatory damages," the district court offered no explanation for why it believed that request was excessive or otherwise unwarranted. *Id*., Vol. 1 at 149.  Nor did the district court point to any other evidence in support of its award, or offer any explanation of the methodology it used in arriving at the total damage figure.

Further, the only evidence in the record that correlates with the district court's total compensatory damage award of $35,000 is Whitten's previous written offer of settlement in that precise amount.  Whitten's written offer of settlement, however, was based solely on his own purported finances, rather than on any damages suffered by the aggrieved employees.  In addition, Whitten's offer of settlement, by its own express terms, was intended to compensate seven of the aggrieved employees, not all eleven.

44

Thus, we reject Whitten's written offer of settlement as a valid basis for the compensatory damage award.

Lastly, we are concerned that the district court inappropriately downplayed the seriousness of the allegations that were admitted by RW2 as a result of the default judgment entered against it. As we have noted, the entry of a default judgment means that the "defendant admits to [the] complaint's well-pleaded facts and forfeits his or her ability to contest those facts." *Tripodi*, 810 F.3d at 764. The district court correctly acknowledged that the EEOC's second amended complaint alleged, in part, that "Whitten used racial epithets, ridiculed an employee's accent, treated Hispanic and Black employees and customers poorly, and otherwise treated the employees of color differently from White employees." Aplt. App., Vol. 2 at 311. But the district court then proceeded to describe the "gravamen" of the second amended complaint as Whitten's no-Spanish policy, and it in turn suggested that Whitten had a legitimate "business necessity" for that policy. *Id*. In our view, the no-Spanish policy was not the gravamen of the EEOC's second amended complaint; instead, that policy was just one of multiple actions on Whitten's part that gave rise to a hostile work environment for the aggrieved employees. Nor is there any basis in the record, given the default judgment that was entered against RW2, for concluding that there was a valid justification for the no-Spanish policy.[12] The district court also referred to the "relatively short time frame in

---

[12] The district court, in mentioning a "business necessity" for Whitten's no-Spanish policy, cited to our decision in *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007). In that case, we concluded that there was a "business necessity" for an "English-only rule" that "prohibited . . . housekeepers from speaking Spanish

which the actions occurred given the abrupt end of the relationship between Mr. Whitten and the charging parties and aggrieved employees" as a potential basis for awarding a much lower total amount of damages than requested by the EEOC. *Id.* at 312. What the district court failed to acknowledge, however, is that, according to the second amended complaint, the "abrupt end of the relationship" was the result of Whitten either terminating the Hispanic hotel employees or forcing them to resign. *Id.*, Vol. 1 at 32 (describing the hostile work environment created by Whitten). Indeed, the district court made no mention of those terminations and resignations at all. And, according to the declarations submitted by the EEOC, it was the terminations and resignations that played a significant role in the suffering of the aggrieved employees.

For all of these reasons, we conclude that the district court's compensatory damage award was clearly erroneous. We in turn conclude that the proper remedy is to reverse the district court's compensatory damages award and remand the case to the district court for further consideration of the issue of compensatory damages.

IV

We REVERSE the district court's dismissal of the EEOC's claims against defendant SGI, AFFIRM the district court's dismissal of the EEOC's claims against

---

solely while working in the operating room department" of the defendant hospital, "and apparently only for job-related discussions." *Id.* at 1171. Here, in contrast, the second amended complaint alleged that Whitten's no-Spanish policy was property-wide and not limited to job-related discussions. And, in any event, the no-Spanish policy was just one of many discriminatory actions committed by Whitten, including, most significantly, his terminations and forced resignations of the hotel's Hispanic employees.

defendant Jai, REVERSE the district court's compensatory damage award against

RW2, and REMAND for further proceedings.

No. 20-2023, *EEOC v. Roark-Whitten Hospitality 2, LP, et al.*

**EID**, J., concurring in part, concurring in the judgment in part, and dissenting in part.

In this case, the original owner, Roark-Whitten Hospitality 2 (RW2), committed numerous violations of Title VII. It then sold the business to Jai Hanuman (Jai), which in turn sold the business to SGI. The question on which the majority and I depart is whether SGI—the successor of the successor—can be held liable under Title VII for RW2's conduct. That question hinges on notice. The majority holds SGI to constructive notice of RW2's Title VII liability because its purchase agreement with Jai provided for a due diligence period. Adequate due diligence, we are told, would have uncovered the Title VII liability. The only reason the majority concludes that Jai is not liable as RW2's original successor is that the complaint contains no allegations supporting a similar theory. But the majority gets the law wrong every step of the way and reaches a profoundly problematic result in the process. Today's expansive interpretation of constructive notice in the Title VII successor liability context turns a provision intended to shield buyers into a sword that holds them to retrospective versions of due diligence with no regard for constructive notice principles.[1] I respectfully dissent.

## I.

"[T]he basic issue in every successorship case is how to strike a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other

---

[1] I concur with the portion of the majority's opinion reversing the damage award, concur in its conclusion that the district court did not apply an improper pleading standard, and concur in its judgment finding the allegations against Jai fail to state a claim for Title VII successor liability.

hand facilitating the transfer of corporate assets to their most valuable uses." *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988) (Posner, J.).  To achieve this balance, courts have emphasized that a successor's "notice" of its predecessor's potential liabilities is "critical."  *See, e.g.*, *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986). In fact, this requirement has been viewed as so important that the Seventh Circuit contemplated whether the "absence of timely *actual knowledge* is a bar to successor liability in every case."  *Id.* at 1237 (emphasis added) (finding that it was "not prepared" to make such a holding in that case).  This is because courts have found "the notice requirement [to] obviate[] the concern . . . that expanded liability would be unforeseen and [thus] likely to discourage corporate transactions."  *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 98 (3d Cir. 2011).  The underlying assumption is that if the successor knew about its predecessor's liabilities, it could "protect itself by an indemnification clause in the acquisition agreement or a lower purchase price."  *Wheeler*, 794 F.2d at 1236.

The majority emphasizes the importance of notice, and I agree.  Maj. op. at 20 (rejecting the EEOC's argument that "successor liability can be imposed even in the absence of notice").  I also agree that either actual or constructive notice may suffice.  *Id.* What I disagree with is the majority's leap to finding constructive notice because SGI reserved a diligence period and allegedly failed to adequately conduct its due diligence. Specifically, I think the majority is wrong to take the following steps in its analysis. First, the majority is wrong to define constructive notice without reference to specific facts putting a party on notice that it should inquire further.  Next, the majority is wrong

2

to contradict, without explanation, the district court's reasonable interpretation of the purchase agreement. Even assuming the agreement did contemplate a duty to investigate and discover pending lawsuits, however, the majority is wrong to conclude that SGI voluntarily undertook that duty for the benefit of RW2's victims in this litigation, as opposed to its own benefit in the transaction with Jai.

**a.**

At the outset, I disagree with the majority about how to define constructive notice. In my view, a successor is only on notice of what a hypothetically diligent investigation would reveal when it possesses information that suggests such an investigation is warranted in the first place. *See Constructive Notice*, Black's Law Dictionary (11th ed. 2019) ("Notice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of."); *Inquiry Notice*, Black's Law Dictionary (11th ed. 2019) ("Notice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further."); *see also, for example, First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998) (defining constructive notice as "notice which is presumed because of the fact that a person has knowledge of certain facts which should impart to him, or lead him to, knowledge of the ultimate fact"). The majority, however, cares little for red flags and other factors that traditionally justify putting a party without actual notice of something on constructive notice. Instead, it finds constructive notice by way of SGI's perceived

3

failure to adequately perform a contractual due diligence duty designed to protect itself during the purchase transaction.[2]

The majority readily admits that there is "little" caselaw addressing what constitutes notice in this context. Maj. op. at 29. Only the Seventh Circuit has recognized that constructive notice can support successor liability in Title VII, but that court has declined to elaborate on what constructive notice means. *See id.* at 30; *see also Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 755 (7th Cir. 1985) (Eschbach, J., concurring) ("The successor must have had actual or constructive notice of the claim or charge of employment discrimination against the predecessor."). As the majority notes, "[t]he Seventh Circuit has not . . . outlined precisely what constitutes constructive notice in this setting." Maj. op. at 30. This dearth of caselaw—and, perhaps, a similar dearth of statutory language[3] and Supreme Court precedent[4] on point—should lead the majority to

---

[2] *See, for example, Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996) (buyer "protected itself by negotiating for two weeks of confirmatory due diligence"); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 235 (3d Cir. 2004) ("[T]hroughout the due diligence process, the due diligence team and the [buyer] communicated regularly and frankly about their assessment of [the seller's] strengths and weaknesses. . . . In fact, the management team took steps to remedy the weaknesses it pinpointed by renegotiating the purchase so as to avoid acquisition of liabilities and risky projects.").

[3] Successor liability has no basis in the text of Title VII. *See Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 825 (D.C. Cir. 2001) (noting that Title VII does not "explicitly address successor liability" and that "courts [have] extend[ed] successor liability beyond the textual bounds of" Title VII) (citing *Wheeler*, 794 F.2d at 1235–36; *Musikiwamba*, 760 F.2d at 745–46).

[4] In *Trujillo v. Longhorn Manufacturing Co., Inc.*, 694 F.2d 221 (10th Cir. 1982), this court adopted the Sixth Circuit's recognition of successor liability in the Title VII context. *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974). *MacMillan*, in turn, borrowed successor liability from the NLRB context as described in *Golden State Bottling Co., Inc. v. NLRB*. *See* 414 U.S. 168 (1973). In that case, the Supreme Court considered "whether the Court of Appeals erred in determining

4

be cautious in expanding successor liability to encompass its novel variant of constructive notice. This is especially so here because the majority makes a purchase agreement's due diligence clause do the heavy lifting. The only other Seventh Circuit case on point explicitly declined to "create[]" a "judicial doctrine" that "focus[ed] . . . on the diligence or lack of diligence of a successor in making inquiry prior to purchase." *Wheeler*, 794 F.2d at 1237.

Undaunted, the majority misinterprets authority that supports my approach to constructive notice to justify its own. First, the majority relies on *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642 (10th Cir. 2013) to suggest that "we have analogized constructive notice" to negligence in the past. Maj. op. at 30. In *Debord*, a technician brought hostile work environment and retaliation claims under Title VII against the hospital that employed her. *Debord*, 737 F.3d at 647. The question in that case was whether another employee's sexual harassment should have been discovered by the employer while it was occurring. We said that "[w]hen a management-level employee has not been notified, as here, we apply what amounts to a negligence standard: highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees." *Id.* at 651 (internal quotation marks omitted). We noted that constructive notice would depend upon "whether the incidents of harassment were so

---

that the evidence offered substantial support for the Board's finding that [the successor] purchased [the predecessor] *with knowledge* of the unfair labor practice litigation." *Id.* at 172 (emphasis added) (internal quotation marks omitted). The Court affirmed, focusing its inquiry on evidence supporting the successor's knowledge of its predecessor's pending litigation. *See id.* at 173–74. Nowhere, however, did the Court mention the successor's due diligence, or lack thereof. *See id.* at 172–74.

5

egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on." *Id.* at 652 (internal quotation marks omitted).

The problem is that *Debord* was not a successor liability case. The majority's assertion that it presents a "relatively similar employment setting[]" misses the critical difference between what an employer should know about conduct happening under its watch and what a successor should know about conduct that happened before its time. Maj. op. at 30; *see also Debord*, 737 F.3d at 652 (discussing test for holding an employer "culpable for failure to discover" ongoing activity). Treating employers and successors the same, from a constructive notice standpoint, is simply illogical. By ignoring this distinction, the majority also fails to recognize that *Debord* ultimately supports my view of constructive notice. That is because, to the extent that *Debord* demanded diligence, it only demanded diligence of employers with respect to the conduct of the employees they supervised or managed. The fact of employment—and the knowledge of the need, under federal law, to maintain a workplace free from sexual harassment—is the decisive difference. It is what led us to conclude that employers could be charged with knowledge of what a diligent investigation of their workplaces would uncover. *See Debord*, 737 F.3d at 651 (noting that "highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees"). Here, by contrast, SGI and Jai had no knowledge supporting a duty to diligently investigate anything. That a particular type of investigation might wind up revealing Title VII liability is irrelevant to whether the law imposes a duty to conduct that investigation in the first place.

6

Next, the majority draws on *Heavenly Hana LLC v. Hotel Union & Hotel Industry of Hawaii Pension Plan*, 891 F.3d 839 (9th Cir. 2018), where the Ninth Circuit held that under ERISA's amendments a successor on constructive notice assumes its predecessor's unpaid withdrawal liability for a multiemployer pension plan. *Id.* at 842. According to the majority, *Heavenly Hana* supports this definition of constructive notice: "purchasers are deemed to have notice of any facts that 'one using reasonable care or diligence should have.'" *Id.* at 845 (quoting *Constructive Knowledge*, Black's Law Dictionary (10th ed. 2014)); *see also* maj. op. at 30. But the majority fails to acknowledge the critical next part of *Heavenly Hana*, a quotation which clarifies that any duty of diligence is *not* freestanding—a clarification the majority eschews. "The plaintiff is deemed to have had constructive knowledge *if it had enough information to warrant an investigation* which, if reasonably diligent, would have led to discovery of the fraud." *Heavenly Hana*, 891 F.3d at 845 (quoting *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988)) (emphasis added). The majority's focus on the results of a hypothetical diligent investigation by SGI comes at the expense of the crucial threshold question whether there was sufficient information to warrant an investigation in the first place.

The majority "glean[s] from these cases that a defendant's failure to reasonably discover information can, *depending upon the circumstances*, including both the pertinent underlying facts and the nature of the claims at issue, *be relevant* to the issue of constructive notice." Maj. op. at 30–31 (emphasis added). As discussed above, I do not think the cases cited by the majority support this vague and heavily qualified articulation of the legal framework for constructive notice in the Title VII successor liability context.

7

Instead, I would hold that notice of Title VII liability may only be constructively imputed where a purchaser ignores red flags that put it on actual notice that it should inquire further. *See Heavenly Hana*, 891 F.3d at 845. Only in that situation should a purchaser be put on constructive notice of what a diligent investigation might reveal. The majority calls this test "perilously close" to an "actual notice" standard. Maj. op. at 35. Far from it, however, this approach follows naturally from cases on constructive notice and helps forge the "proper balance" that is essential to successor liability. *See Vucitech*, 842 F.2d at 945. For example, if SGI had been made aware of potential employee grievances during RW2's ownership and did nothing to investigate the matter or protect itself before finalizing the deal, it is reasonable that constructive notice would arise. The same would be true if Jai had responded to SGI's inquiry about liabilities by alluding to the existence of ongoing lawsuits, and SGI let the matter rest. Merely contracting for a due diligence period and taking advantage of that opportunity, *see* maj. op. at 33, did not provide SGI *any* information that would warrant a particular investigation.

### b.

The majority proceeds to apply its constructive notice framework by discussing how SGI's purchase agreement with Jai entailed a duty of due diligence. The first step in this endeavor is overriding the district court's interpretation of that agreement. As the district court summarized, the EEOC's complaint "quotes portions of the purchase agreement signed by SGI's principal where the parties agreed that the property would be sold 'as is,' that SGI waived all claims against the seller for any losses, and that the buyer would inspect the property condition." Aplt. App'x Vol. I at 140. The district court

8

reasoned that "these allegations say nothing about SGI's duty to perform due diligence vis-à-vis the behavior or liabilities of the previous corporations that owned the property. Rather, by their plain language, these terms allocated liabilities concerning the parcel of land." *Id.* The majority disposes of this obstacle in a footnote, saying only that it "disagree[s] with the district court's conclusion and instead read[s] the EEOC's allegations more broadly as indicating that SGI assumed the duty to investigate all of the liabilities associated with the business it was purchasing." Maj. op. at 31 n.5. While it is within the scope of our review to reach a contrary interpretation of the complaint and purchase agreement, I think the district court had it right. The EEOC failed to allege that SGI assumed anything resembling a specific duty of due diligence respecting past Title VII liability.

Even assuming the majority is correct that SGI undertook a duty to diligently investigate the seller's (and the seller's predecessors') Title VII liability, the majority is wrong to suggest this duty somehow runs to the EEOC plaintiffs in their attempt to allege constructive notice in this action. It is only Title VII that could impose such a legal duty, but none of the cases support that. *See Wheeler*, 794 F.2d at 1237. Whatever its scope, SGI's undertaking was clearly for its own benefit in the transaction with Jai, and not for the EEOC's benefit in this case. *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 316 (5th Cir. 2002) ("[T]he negligent failure to perform a contractual duty normally does not support a separate tort cause of action."). But the majority does not hesitate to conclude that a due diligence provision meant to protect SGI

9

as a buyer caused it to bear any and all Title VII liability that might be found along the path of diligence.

## II.

The unmoored duty of diligence advanced by the majority is particularly problematic because, without any reference point—or "information to warrant an investigation," as the Ninth Circuit put it—what the duty entails is unclear. *See Heavenly Hana*, 891 F.3d at 845. This case is a prime example. The majority does not mention it, but SGI's experienced, licensed broker declared that he conducted "typical and thorough" due diligence before SGI's purchase, including reviewing the property's title report and asking the seller's broker about defects, liabilities, and "anything else that SGI should be aware of." Aple. SGI App'x at 2. This inquiry revealed "no 'red flags' or any other basis" to know of the EEOC's action. *Id.* at 2–3. Based on his thirty years of experience, the broker further declared that it would have been "highly unusual to search court records for potential liabilities related to the property" as he had "never seen such a search conducted," and that Google searches are "not customary" due diligence for this type of transaction. *Id.* at 2. SGI's President confirmed at his deposition that he conducted his own due diligence along these lines, including online research and physical inspections. Finding the business in bad shape, he asked for $300,000 back at closing. But the majority apparently disagrees about how purchasers should do their due diligence.

The majority holds that the EEOC stated a claim for successor liability because the agency alleged that a diligent investigation would have revealed the existence of this

10

proceeding.[5]  But due diligence clauses in purchase agreements are commonplace.  All that Title VII plaintiffs must do to plead successor liability after this case is allege that any buyer who contracted for a diligence period to protect itself was insufficiently diligent respecting the seller's Title VII liability.  And all that Title VII plaintiffs must do to prove successor liability is convince a court that there was some way that—however hard the buyer looked, and notwithstanding a seller's concealment—the buyer could have discovered the seller's Title VII liability.  This turns constructive notice on its head.  As the district court reasoned, "[i]mposing a duty to uncover an employment dispute involving a predecessor's predecessor, with little or no knowledge of circumstances that mandate further inquiry, would turn constructive notice into needle-in-a-haystack notice." Aplt. App'x Vol. I at 142.

The majority finds a sufficiently stated claim because it is alleged that SGI was in a hurry to buy the business from Jai and did not perform sufficient due diligence regarding the Title VII liability of its predecessor's predecessor, which operated under a different name from the business it was buying.  To me, this is beside the point.  Under a proper understanding of constructive notice, SGI had no reason to conduct that search, so it was not on constructive notice of anything it would reveal.  The same is true of Jai. Even under the majority's mistaken view of constructive notice, SGI did its due

---

[5] According to the majority, the allegations in the EEOC's complaint, if proved, "would establish that SGI reasonably should have been aware of the EEOC's pending claims at the time of purchase."  Maj. op. at 32.  While these allegations may meet the majority's test for constructive notice at the 12(b)(6) stage, the EEOC's ability to prove those allegations is a separate matter entirely.

diligence.  Avoiding the crucial issue whether a purchaser has enough information to warrant an inquiry, the majority substantially expands Title VII successor liability by imposing an indeterminate duty of due diligence on all purchasers of businesses who try to protect themselves by providing for a diligence period in the contract, even when they do perform that diligence.  It seems that all the majority thinks a successor needs to know to be on notice is the name of the company it is buying and a commitment to investigate the seller that is inevitable in any transaction.  But that is not notice, constructive or otherwise.  That is strict liability.  In my view, constructive notice is about what a party actually knew at the relevant time and where that should have led it, not what the majority thinks could have been found if a buyer that reserved a diligence period to protect itself had done a better job of protecting itself.

Far from "strik[ing] a proper balance" between the competing interests at the heart of any successor liability problem, the majority strikes no balance at all.  *See Vucitech*, 842 F.2d at 945.  When considering the prevalence of due diligence clauses in purchase contracts and their utility to buyers, the majority's result borders on imposing a freestanding and indeterminate duty of due diligence on all successors.  I disagree with the proposition that contracting for a diligence period put SGI on notice of what it might have discovered if it had done its diligence differently, and I think the majority has failed to uncover sufficient support for its "'failure to discover' standard," maj. op. at 31, in either Title VII, the cases interpreting it, or other cases discussing constructive notice.  I would affirm the district court's dismissal of the successor liability claim against SGI.

12